Constantine P. Economides (CBN 363454)
ceconomides@dynamisllp.com
**DYNAMIS LLP**
1 SE 3rd Avenue, Suite 1000
Miami, FL 33131
(305) 985-2959

Nicolas Stebinger (*pro hac vice*)
nicolas@simonsensussman.com
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 384-3130

*Counsel for Plaintiffs Joel Casciani, Paola Hartman, Travis McMichael, Ernest Scoggan, and Crystal Turnbough*
[Additional counsel identified on next page]

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

JOEL CASCIANI, PAOLA HARTMAN, TRAVIS MCMICHAEL, ERNEST SCOGGAN, and CRYSTAL TURNBOUGH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KALIBRATE PRICING INC., 7-ELEVEN, INC., SPEEDWAY LLC, EG RETAIL (AMERICA), LLC, BP PRODUCTS NORTH AMERICA INC., TRAVELCENTERS OF AMERICA INC., TA OPERATING LLC, WALMART INC., CIRCLE K STORES INC., TMC FRANCHISE CORPORATION, ALBERTSONS COMPANIES, INC., ALBERTSONS SAFEWAY LLC, and DOE CORPORATIONS 1-10,

Defendants.

Case No. 2:26-cv-02211-DAD-CSK

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Additional counsel for Plaintiffs:

Ryan Class (*pro hac vice*)
rclass@dynamisllp.com
Michael B. Homer (*pro hac vice*)
mhomer@dynamisllp.com
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 802-9157

Shaoul Sussman (*pro hac vice*)
shaoul@simonsensussman.com
Paul Goodrich (*pro hac vice*)
paul.goodrich@simonsensussman.com
Victoria Field (*pro hac vice*)
victoria.field@simonsensussman.com
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
(646) 400-6652

## NATURE OF THE ACTION

1. For California drivers, the pain at the pump has reached a breaking point. While a global energy crisis and military conflict in Iran have pushed gasoline and diesel as high as $7.00 per gallon, Californians are being forced to pay surcharges that cannot be explained by crude oil costs, refining costs, environmental regulation, or taxes.

2. Part of the cause of California's astronomical fuel prices is an illegal algorithmic price-fixing scheme orchestrated by the algorithmic pricing company Kalibrate and some of the state's largest fuel retailers.

3. This artificial surcharge inflicts a severe, daily financial toll on millions of Californians who rely on their vehicles for basic necessities. For everyday commuters, the inflated cost of fuel means struggling to afford the gas needed to travel to work, care for loved ones, or visit family. And for those whose livelihoods are directly tied to the road, including truck drivers transporting essential goods and ride-hailing drivers, these higher prices swallow their hard-earned income, inflicting unsustainable hardship.

4. Historically, gas stations have competed for customers by aggressively undercutting one another's retail prices. But today, that vibrant street-corner retail competition is being replaced by automated, algorithmic coordination.

5. Kalibrate is a driving force behind this new anticompetitive reality. Kalibrate provides the central nervous system for a conspiracy to extinguish retail price competition among gas stations: Kalibrate Fuel Pricing, an algorithmic, AI-based pricing system that connects directly to gas stations' pumps and signs. Instead of lowering prices to attract drivers, Kalibrate Fuel Pricing relies on the data of competing gas stations to coordinate high prices and wring more money from the pockets of consumers throughout the state. Kalibrate Fuel Pricing thus facilitates collusion by enabling competing gas stations to coordinate prices and share information without ever communicating with each other.

6. Kalibrate's pitch to gas station operators is as cynical as it is effective: Kalibrate promises that if gas stations surrender their pricing decisions and competitively sensitive cost and volume data to Kalibrate Fuel Pricing, the software will enable them to avoid competing

with other area stations and to charge higher prices to consumers. Kalibrate Fuel Pricing even includes a feature to launch “restorations”—phenomena where nearly all stations in a market contemporaneously implement large price hikes.

7. In other words, gas stations share commercially sensitive information with Kalibrate, which consolidates and synthesizes the data into price recommendations that automatically set gas prices, giving each station confidence that its inflated prices will not be undercut by competitors.

8. Defendants 7-Eleven, Inc. (“7-Eleven”), Speedway LLC (“Speedway”), EG Retail (America), LLC (“EG America”), BP Products North America Inc. (“BP”), TravelCenters of America Inc. (“TravelCenters”), TA Operating LLC (“TA Operating”), Walmart Inc. (“Walmart”), Circle K Stores Inc. (“Circle K”), TMC Franchise Corporation (“TMC Franchise”), Albertsons Companies, Inc. (“Albertsons”), Albertsons Safeway LLC (“Safeway”), and Doe Corporations 1-10 (collectively the “Gas Station Defendants”) are among the gas station companies that have accepted the invitation of Kalibrate Pricing Inc. (“Kalibrate”) to collude and use Kalibrate Fuel Pricing to make California drivers pay more for each gallon of fuel.

9. For the Gas Station Defendants, this price-over-volume strategy has led to supracompetitive profit margins. For California consumers, the cost is staggering. Because of the volume of gasoline sold across California, a single cent increase at the pump will drain a whopping $134 million from California drivers’ wallets every year across the state. While families struggle to afford the commute to work, Defendants have conspired to put an end to competition, joining an AI-powered trust to ensure that no matter where a driver turns, the price for gasoline and diesel is artificially high.

10. By entering into these agreements to outsource their pricing decisions to Kalibrate Fuel Pricing, Defendants have violated the Cartwright Act, California’s cornerstone antitrust law. This conduct constitutes an unlawful trust—a combination of capital, skill, or acts by two or more persons to fix, control, or establish the price of a commodity.

11. Specifically, the Gas Station Defendants have replaced independent, competitive pricing with a coordinated, automated mechanism that relies on sensitive competitor data and a

conscious decision to ensure that prices remain artificially high. These acts represent a modern, digital iteration of traditional price-fixing and combination that California law expressly forbids.

12. Plaintiffs bring this suit to put a stop to Defendants' unlawful combination and collusion, restore competition to California's retail fuel markets, and make California drivers whole by compensating them for the substantial overcharges Defendants have extracted from them through their illegal scheme.

**PARTIES**

13. Plaintiff Joel Casciani is a resident and domiciliary of Chula Vista, California.

14. Plaintiff Paola Hartman is a resident and domiciliary of Homeland, California.

15. Plaintiff Travis McMichael is a resident and domiciliary of Lake Elsinore, California.

16. Plaintiff Ernest Scoggan is a resident and domiciliary of Palmdale, California.

17. Plaintiff Crystal Turnbough is a resident and domiciliary of Marysville, California.

18. Defendant Kalibrate offers pricing and location analytics software for a broad range of industries including retail, restaurant, retail fuel, grocery, healthcare, education, banking, private equity, and franchising. Kalibrate contracts with customers to license its fuel pricing and location intelligence software at transportation fuel retail locations across California. Kalibrate is a New Jersey corporation with its principal place of business in Livonia, Michigan. Kalibrate is a wholly owned subsidiary of Intalytics, Inc., the successor company of Knowledge Support Systems, Inc.

19. Defendant 7-Eleven owns and operates convenience stores and transportation fuel stations in California and across the United States. Though some of 7-Eleven's sites operate as franchises, 7-Eleven maintains pervasive direct and indirect control over the day-to-day operations of these stations by mandating specific technological standards, marketing strategies, and operational protocols, including these locations' adoption and implementation of Kalibrate Fuel Pricing through at least 2023. 7-Eleven is incorporated under the laws of Texas, with its headquarters and principal place of business in Irving, Texas.

20. 7-Eleven also owns and operates transportation fuel stations through its wholly owned subsidiary Speedway (together with 7-Eleven, the "Speedway Defendants") under the Speedway and Speedway Express brands. 7-Eleven maintains pervasive direct and indirect control over the day-to-day operations of these Speedway and Speedway Express-branded stations by mandating specific technological standards, marketing strategies, and operational protocols, including these locations' adoption and implementation of Kalibrate Fuel Pricing through at least 2023. Speedway is a Delaware limited liability company wholly owned by 7-Eleven, with its headquarters and principal place of business in Irving, Texas. Because 7-Eleven owns 100% of Speedway, Speedway's place of domicile, for the purposes of diversity jurisdiction, is the same as 7-Eleven's place of domicile.

21. Defendant EG America controls convenience stores and transportation fuel stations in California and across the United States, including convenience stores and fuel stations in California operating under the "Quik Stop" brand. Though a portion of the Quik Stop sites operate as franchises, EG America maintains pervasive direct and indirect control over the day-to-day operations of these Quik Stop-branded convenience stores and fuel stations by mandating specific technological standards, marketing strategies, and operational protocols, including these locations' adoption and implementation of Kalibrate Fuel Pricing. Indeed, as Kalibrate's own website makes clear, EG America elected to transition its "entire network . . . to Kalibrate's centralized Pricing Software." EG America is a Delaware limited liability company. EG America's parent company is EG America, LLC, which is in turn owned by EG Finco Limited, a limited liability company organized, existing, and doing business under the laws of England and Wales, with its headquarters in Bolton, England, United Kingdom. Because EG Finco Limited owns 100% of EG America, LLC, which in turn owns 100% of Defendant EG America, EG America's place of domicile, for the purposes of diversity jurisdiction, is the same as EG Finco Limited's place of domicile.

22. Defendant BP is a wholly owned indirect subsidiary of BP p.l.c., a large, vertically integrated company spanning many levels of the fuel industry, from extraction to refineries to retail. BP exercises control over the "ARCO" and "ampm" retail transportation fuel

and convenience store brands in parts of California by licensing the “ARCO” brand name from Marathon Petroleum. BP maintains its extensive retail presence in California through a combination of owned-and-operated sites and franchise relationships. Defendant BP has deployed Kalibrate Fuel Pricing in retail transportation fuel stations across California, including stations within the localities described in the Complaint. BP is incorporated under the laws of Maryland, with its principal place of business in Chicago, Illinois.

23. Defendant TravelCenters is a wholly owned indirect subsidiary of Defendant BP. TravelCenters operates full-service truck stop and travel centers with sites in California under several brands: TA, TA Express, Petro, Petro Stopping Center, Minit Mart, and GOASIS. Among the many services offered at its locations, TravelCenters sites sell retail transportation fuel. TravelCenters sites use Kalibrate Fuel Pricing. TravelCenters is incorporated under the laws of Maryland, with its principal place of business in Westlake, Ohio.

24. Defendant TA Operating (together with BP and TravelCenters, the “TravelCenters Defendants”) is a wholly owned direct subsidiary of Defendant TravelCenters. TA Operating owns and operates convenience stores and transportation fuel stations in California under the TravelCenters of America, TA, TA Express, Petro, Petro Stopping Center, and GOASIS brands. TA Operating have contracted with Kalibrate for use in defendant TravelCenters’ stations for Fuel Pricing. TA Operating is organized under the laws of Delaware, with its principal place of business in Westlake, Ohio. Because TravelCenters owns 100% of TA Operating, TA Operating’s place of domicile, for the purposes of diversity jurisdiction, is the same as TravelCenters’ place of domicile.

25. Defendant Walmart is an international retail giant, selling a broad assortment of items and services through its brick-and-mortar locations and e-commerce platform. In addition to its substantial role in retail and e-commerce, Walmart operates retail transportation fuel and convenience stores in California under the “Walmart” brand. Walmart contracts with Kalibrate for the use of Kalibrate Fuel Pricing. Walmart is incorporated under the laws of Delaware with its principal place of business in Bentonville, Arkansas.

26. Defendant Circle K owns and operates several retail transportation fuel and convenience store brands in California: Circle K, Kangaroo Express, and Holiday Stationstores. These branded fuel stations use Kalibrate Fuel Pricing. Circle K is incorporated under the laws of the state of Delaware, with its principal place of business in Tempe, Arizona.

27. Defendant TMC Franchise (together with Circle K, the "Circle K Defendants") is a wholly owned subsidiary of Defendant Circle K. TMC Franchise exercises control over certain retail transportation fuel and convenience store brands in California operating under the Circle K brand. TMC Franchise maintains this retail presence in California through a franchisor-franchisee relationship. Through this model, TMC Franchise, as franchisor, maintains pervasive direct and indirect control over the day-to-day operations of these franchised locations by mandating specific technological standards, marketing strategies, and operational protocols, including having the right to control and substantially controlling franchisees' adoption and implementation of Kalibrate Fuel Pricing. TMC Franchise is incorporated under the laws of the state of Arizona, with its principal place of business in Tempe, Arizona.

28. Defendant Albertsons owns and operates supermarkets and drugstores in California and across the United States. In addition to its substantial role in the supermarket and drugstore sector, Albertsons operates retail transportation fuel stations in California under the Safeway brand through its wholly owned subsidiary Safeway (together the "Albertsons Defendants"). Albertsons contracts with Kalibrate for use of Kalibrate Fuel Pricing at its Safeway fuel stations in California. Albertsons is incorporated under the laws of the state of Delaware, with its principal place of business in Boise, Idaho.

29. Defendant Safeway is a Delaware limited liability company wholly owned by Albertsons. Because Albertsons owns 100% of Safeway, Safeway's place of domicile for purposes of diversity jurisdiction is the same as Albertsons' place of domicile.

30. None of the named defendants is a citizen of or domiciled in California.

31. John Doe Corporations 1-10 are as-yet unidentified gasoline and diesel retail companies operating in the State of California and using Kalibrate Fuel Pricing. The Doe Corporations cannot be presently identified because Kalibrate keeps the identities of most of its

Kalibrate Fuel Pricing customers and the locations of the gas stations using its software confidential. When these John Doe Corporations are identified, they will be added through amendment and served as required by law.

**JURISDICTION AND VENUE**

32. This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, this is a class action in which members of each class and Defendants are citizens of different states, and the number of members of each proposed class is greater than 100.

33. This Court further has subject matter jurisdiction over this civil action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and Plaintiffs and Defendants are citizens of different states.

34. This Court has personal jurisdiction over Kalibrate. Kalibrate has sufficient minimum contacts with this District and has purposefully availed itself of the privilege of doing business in this District such that it could reasonably foresee litigation being brought in this District. Among other things, Kalibrate has marketed and sold its Kalibrate Fuel Pricing services to firms like the Gas Station Defendants who operate gas stations in this District. Through Kalibrate Fuel Pricing, Kalibrate sets and adjusts prices for gasoline and diesel at the pumps of Gas Station Defendants' stations within this District, and this action arises out of Kalibrate's contacts within this District. Kalibrate has harmed consumers within this District and has derived substantial revenue from its conduct within this District.

35. The Gas Station Defendants similarly have sufficient minimum contacts with this District and have purposefully availed themselves of the privilege of doing business in this District such that they could reasonably foresee litigation being brought in this District. Among other things, this action arises out of the Gas Station Defendants' use of Kalibrate Fuel Pricing to set prices for gasoline and diesel at their stations within this District. The Gas Station Defendants have harmed consumers within this District and have derived substantial revenue from their conduct within this District.

36. Defendants are further subject to personal jurisdiction under California Code of Civil Procedure § 410.10 because they have purposefully established significant contacts with the State of California and its citizens, including by transacting with California retail gas stations to provide services related to fuel pricing, and by transacting with California citizens to engage in the retail sale of gasoline and diesel. In establishing and maintaining these and other contacts, the Defendants have availed themselves of the benefits and protections of California law.

37. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction within this District with respect to this civil action and a substantial part of the events giving rise to Plaintiffs' claims occurred within this District. Specifically, each of the Gas Station Defendants operates retail fuel locations using Kalibrate Fuel Pricing within this District.

## FACTS

### I. Gasoline and Diesel-Powered Vehicles Are a Pervasive and Expensive Part of Life for Californians

38. California's economy and the daily lives of its nearly 40 million residents are inextricably tied to cars. Despite the state's aggressive push toward electrification and mass transit, California car culture remains a dominant reality, with approximately 27 million gasoline-powered passenger vehicles currently on the road. For the vast majority of Californians, particularly those in the state's sprawling inland and suburban regions, fueling their vehicles is not a discretionary purchase. It is rather a mandatory expense required to access work, school, and basic services. Each year, California drivers consume 13.4 billion gallons of gasoline and 3.5 billion gallons of diesel, making the state one of the largest and most lucrative fuel markets in the world.

39. As of June 2026, the price spread between California and the rest of the United States has widened, with Californians paying a premium of approximately $1.68 per gallon above the national average.




40. California's geography, limited refining capacity, and emissions standards account for only a piece of these high prices. Even accounting for taxes and environmental programs, gasoline and diesel in California are both extremely expensive, and more expensive than is warranted by wholesale acquisition costs.[1]

41. While refinery consolidation and a dearth of out-of-market imports play an unquestionable role in facilitating high wholesale gasoline and diesel prices in California, the retail fuel landscape in California also is dominated by a handful of multinational conglomerates. This concentration is not accidental. It was a calculated effort by the industry's largest participants to gain the scale and market density necessary to move away from competition and toward a profit-extraction strategy. These giants—including the Gas Station Defendants—now

[1] State of Cal. Energy Comm'n. & Dep't of Tax and Fee Admin., *2024 Review of the Price of Gasoline in California and Related Impact on State Revenues* 18, 27 (May 2024), https://seuc.senate.ca.gov/sites/seuc.senate.ca.gov/files/cdtfa_cec_joint_report_2024_review_of_the_gasoline_in_california_and_relate.pdf.

collectively control a substantial share of the gas stations on many of the prime corners and high-traffic highway corridors across California.

42. As these dominant players in retail fuel looked for ways to extract value and avoid the race to the bottom that characterizes competitive markets, they increasingly turned to sophisticated technology to manage their vast networks.

43. Historically, retail pricing for gasoline and diesel has been fiercely competitive. Gas stations would seek to attract customers by undercutting the prices of other nearby gas stations. Gas stations thus would chase one another's prices down as far as they were able (taking account of their costs), in the hope of convincing more drivers to fuel at their pumps. This competition was intense enough that gas stations would adjust prices even by tenths of a cent to make their fuel appear cheaper than the station across the street. This downward price retail competition benefits consumers by resulting in lower prices for gasoline and diesel for their vehicles. But when consumers pay less for fuel, gas stations earn lower profits on each gallon sold.

44. Kalibrate offers gas station operators a tool to avoid this retail price competition and to wring as much money as possible from California drivers' wallets: Kalibrate Fuel Pricing.

## II. Kalibrate Fuel Pricing Is Designed and Marketed to Eliminate Fuel Price Competition Between Gas Stations

45. Kalibrate Fuel Pricing is software based on a common pricing algorithm that sets fuel prices at the pump for Kalibrate's gas station customers. It connects a gas station's pumps and signage to Kalibrate's central Pricing Cloud. Kalibrate Fuel Pricing's algorithm then automatically sets the gas station's fuel price at its pumps, signage, and points of sale.

46. Kalibrate's marketing proposition is straightforward: Kalibrate tells its customers that by surrendering their fuel price decisions to Kalibrate Fuel Pricing, they will increase their margins and profits on fuel sales. Kalibrate's advertising materials make clear that Kalibrate Fuel Pricing achieves these higher prices by collecting data about all of an area's competitors and then implementing a common pricing algorithm that coordinates its users to refrain from competing on price.

### *A. Kalibrate Fuel Pricing Relies on Users Abdicating Control of Pricing to a Common Pricing Algorithm*

47. Kalibrate warns its customers (i.e., gas stations) that if they do not rely on its automated pricing, they will be limited in the benefits they can achieve and may even cause unnecessary price volatility for themselves and their competitors. In its promotional materials, Kalibrate offers its users lighthearted advice on "[h]ow to overcome fuel price automation anxiety":

> **Auto-implementation**
>
> *noun*
>
> *The process of automatically applying fuel prices to a product, product group, site, or network, that have been generated by a pricing software system.*

48. Kalibrate also makes clear to its potential customers that where customers have allowed its algorithm to take over pricing decisions, "there is **less fluctuation** and **gross margins have increased significantly** and are now more predictable."

49. Though gas station operators can in theory manually override Kalibrate Fuel Pricing, Kalibrate boasts in its marketing materials that in practice its users surrender as much as 90% of their pricing decisions to its algorithm. Thus, Kalibrate's customers delegate nearly all of their pricing decisions to Kalibrate Fuel Pricing. This nearly absolute delegation and automation are core to the value proposition of Kalibrate Fuel Pricing.

50. Defendant EG America, like the rest of Gas Station Defendants, has turned over its pricing to Kalibrate Fuel Pricing's algorithm. In a testimonial on Kalibrate's website, EG America's Manager of Retail Petroleum Pricing said: "I have a great deal of faith and fidelity in the system, that our pricing decisions are being made automatically . . . ."

### *B. Kalibrate's Customers Use Kalibrate Fuel Pricing Not to Compete, But to Coordinate Price Increases*

51. In a competitive market, gas stations use information about competitor pricing to undercut one another's prices and attract consumers. But Kalibrate tells its users that with Kalibrate Fuel Pricing, they can do the opposite: Kalibrate Fuel Pricing uses public and non-public data funneled from competing gas stations in an area to help its users to instead coordinate and charge higher prices to consumers.

52. Kalibrate Fuel Pricing is widely used in the United States. Kalibrate wants its customers to know that other gas stations in their markets also use Kalibrate Fuel Pricing to maintain higher prices: It advertises that Kalibrate Fuel Pricing sets fuel prices for "8 of the top 10 fuel retailers in the USA," and for 14 of the top 20 convenience store chains.

53. This is because coordination among gas stations using Kalibrate Fuel Pricing is important to the value Kalibrate delivers. If only one gas station in an area uses Kalibrate Fuel Pricing to raise prices, customers may divert to its lower-priced competitors for fuel. But if multiple competitors use Kalibrate Fuel Pricing to raise prices together in an area, consumers run out of low-priced options, and the gas stations can increase prices without losing so much volume that the increase becomes unprofitable.

54. Kalibrate purposely markets Kalibrate Fuel Pricing as a way for its customers to avoid competing with one another on price. Kalibrate urges on its website that even in the face of "falling oil prices . . . it's critical to avoid a race to the bottom." Kalibrate tells its customers that they should work together to increase their profits on the backs of drivers: "Your competitors look to you to set the prices and will just modify their prices accordingly." Kalibrate warns its customers that price competition is harmful to both their profits and their competitors' profits: "If you're the influencer in that market, you could be making a change that triggers a downward spiral and has negative implications for everyone operating in that market." Kalibrate tells potential customers in its promotional materials that trying to drop prices to drive volume over a short period of time is "largely a waste of time."

55. Kalibrate makes clear in its advertising that Kalibrate Fuel Pricing can help customers to avoid this downward price competition with other gas stations. By using Kalibrate Fuel Pricing to set prices instead of relying on gas station operators' analog, emotional, and competitive instincts, Kalibrate tells its customers they can work together to keep prices high even at times when wholesale prices are falling. By keeping prices high across the market, Kalibrate Fuel Pricing enables gas stations to "see more long-term success . . . than by sacrificing margin in an attempt to draw volume":

> # Don't get caught up in panic
>
> While fuel markets are currently experiencing sudden, unexpected volatility, it's important to find efficiencies where you can — now more than ever.
>
> While falling oil prices are never reflected as quickly on the forecourt as the press would like, supermarkets are already beginning to slash prices. But it's critical to avoid a race to the bottom. Take a step back to evaluate your network. You'll see more long-term success by doing this than by sacrificing margin in an attempt to draw volume.

56. Kalibrate provides its customers with much more than high-level suggestions about how to use Kalibrate Fuel Pricing to coordinate durable high prices with one another. Kalibrate Fuel Pricing takes into account all of the competing gas stations in a market and optimizes prices to meet a given gas station's target margin. Kalibrate Fuel Pricing achieves this outcome by using a vast set of public and nonpublic pricing and volume data to identify to its customers how other gas stations would adjust their prices in reaction to a customer's own price shift. By incorporating competitors' reactions into its automated price-setting, Kalibrate Fuel Pricing enables the gas stations in a given market to work collectively to "squeeze out profit"

across the market by keeping prices artificially high together. Coordinating price changes with nearby competitors is built into Kalibrate's model:




57. Kalibrate Fuel Pricing even contains tools within its interface for its customers to explicitly and purposely execute coordinated price increases jointly with their competitors in a given area. For example, a "restoration" is a phenomenon where nearly all gas stations in an area raise their prices contemporaneously and by a large amount. Kalibrate Fuel Pricing's customer interface includes a feature that allows customers to initiate or join these market-wide price-hikes:




58. The price effect of fuel retailers switching to Kalibrate Fuel Pricing is significant and immediate. Research on algorithmic pricing by gas stations—including Kalibrate Fuel Pricing—has shown that where gas stations switch to collusive algorithmic pricing software such as Kalibrate Fuel Pricing, the mean price increase can be roughly 6 cents per gallon at today's high prices. However, where a high proportion of an area's stations have adopted the software, gasoline prices may increase as much as 4.5%, or 30 cents per gallon. Though Kalibrate keeps much of its customer information confidential, public records reflect that when a California Safeway site adopted Kalibrate Fuel Pricing during a time of lower overall fuel prices, its retail fuel prices quickly increased by 3 to 4 cents per gallon, consistent with this research. Kalibrate likewise has advertised that using Kalibrate Fuel Pricing results in an increase in margins and

profits while selling fewer gallons overall—a hallmark of anticompetitive behavior. *See* Cal. Bus. & Prof. Code § 16720(b) ("A trust is a combination of capital, skill or acts . . . [t]o limit or reduce the production, or increase the price of merchandise or of any commodity.").

### *C. Kalibrate Fuel Pricing Incorporates Data from All of the Competing Gas Stations in a Market, Including Its Customers*

59. To power the collusive common pricing algorithm of Kalibrate Fuel Pricing, Kalibrate has amassed large amounts of both public and nonpublic data to facilitate its customers charging supracompetitive prices. Kalibrate advertises that it "collects raw data from over 6000 sources" and that is has assembled "[v]ast, far-reaching fuel retail data sets." This data ranges from public surveys to proprietary third-party reports, volume data, and surveillance of consumers' cellphone location data.

60. Kalibrate boasts that it offers its customers "[c]omplete visibility on [their] competitors"—including those competitors who also provide their confidential pricing and volume data to Kalibrate Fuel Pricing:




61. Kalibrate's customers, including the Gas Station Defendants, understand that one of the primary benefits of using Kalibrate Fuel Pricing is access to their competitors' non-public pricing and volume data. As explained in further detail at paragraphs 139 to 141, the unique benefits flowing from the access and use of competitors' data are also corroborated by independent academic research. In fact, Kalibrate includes customer testimonials on its website

emphasizing the importance of the unique non-public competitor data Kalibrate possesses, which only its customers are allowed to access. In product demos, Kalibrate also has shown potential customers the confidential, non-public, competitively sensitive information of competing gas stations—including non-public, competitively sensitive fuel sales volumes—that Kalibrate would make available to them.

62. One customer testimonial gushes about how Kalibrate Fuel Pricing has allowed it to better understand how its competitors' decisions affected its own profits: "It's given us tons of visibility into the competitive landscape and how that affects our volume and margin, that we simply didn't have before . . . ."

> *"What mattered most to us is speed and accuracy of competitive pricing. We just couldn't trust the data we were seeing in the other platforms."*

63. Another customer similarly explains how Kalibrate Fuel Pricing allows it to coordinate pricing with its competitors based on the proprietary data Kalibrate provides about those competitors: "[Q:] How does the data and insight in Kalibrate influence your fuel pricing decisions? [A:] The data and insight that we receive, it's brought into one place into Kalibrate, so it's very easy for me to look at and understand a competitor's way of thinking or how they'll react to something, or a move that I made. . . . If someone challenges me on a decision, it's very easy for me to go back and explain how or why I chose that price based on learning competitor behavior . . . ."

64. Kalibrate's customers, including the Gas Station Defendants, also understand that Kalibrate Fuel Pricing will improve their margins only if they provide Kalibrate with their own competitively sensitive inventory, pricing, cost, volume, and market data to be processed in conjunction with their competitors' data.

65. In the retail fuel market, demand elasticity measures how sensitive drivers are to price differences between nearby competing stations, or in other words the number of customers who would switch to a competing gas station in response to a price hike. While gas stations can

and do independently adjust their prices, doing so under normal competitive conditions carries an inherent risk. If a station raises its prices too much on its own, drivers will simply divert to a cheaper nearby competitor or will purchase less fuel, rendering the price increase unprofitable.

66. Kalibrate Fuel Pricing makes it significantly easier to execute these price increases and minimize competition between gas stations.

67. Accurately assessing demand elasticity requires analyzing two distinct core inputs: retail prices, which are often public, and the corresponding sales volume data of gas stations in a given area, which is strictly non-public.

68. Using real-time data from local rivals, Kalibrate harnesses sophisticated algorithms to model elasticity between stations in a given area and coordinate price increases in a way that individual gas stations otherwise could not accomplish without illegally conspiring:

> You should be able to relate your prices, and competitor prices, to volume. Employ an elasticity model to strike the balance between not dropping the price too quickly, and not being seen to lag behind. To monitor and manage this level of data, and respond to such rapid market changes, you need to shift away from manual pricing and embrace automation.

69. This mutual reliance on non-public data about competing gas stations provides the Gas Station Defendants with the economic insights and confidence necessary to successfully increase pump prices. Instead of risking a costly drop in volume, the software gives participating stations a higher degree of certainty that they can raise prices across the board while ensuring they do not lose too many sales to neighboring competitors. As stated by the Head of Product Management for Kalibrate Fuel Pricing in a promotional video: "[I]t's really important that you utilize AI with a strong knowledge of both your customers and your competitors."

70. Below is a diagram created by Kalibrate illustrating the combination of public and non-public data that feeds into Kalibrate Fuel Pricing to enable price increases:




**III. The Gas Station Defendants Use Kalibrate Fuel Pricing to Fix Prices in California**

71. The TravelCenters Defendants operate 16 retail fuel stations across California, including in the Coachella market. In addition, BP controls ARCO-branded stations throughout Central and Northern California. The TravelCenters Defendants have licensed Kalibrate Fuel Pricing to automate and raise prices in their stations' markets since at least 2023.

72. EG America operates more than 90 retail fuel stations in California, including in the Yuba City market. EG America has used Kalibrate Fuel Pricing to automate and raise prices in its stations' markets since at least 2020.

73. 7-Eleven controls hundreds of 7-Eleven-branded fuel stations across California, including in the Brawley, Chico, Los Banos, Marina, Redding, Twentynine Palms, and Yuba City markets. 7-Eleven has licensed Kalibrate Fuel Pricing to automate and raise prices in its stations' markets from 2019 to at least 2023. 7-Eleven, together with Defendant Circle K, remains prominently featured on Kalibrate's website today:




74. The Speedway Defendants operate more than 150 Speedway-branded retail fuel stations in California, including in the Redding market. The Speedway Defendants have used Kalibrate Fuel Pricing to automate and raise prices in their Speedway stations' markets since at least 2021 to at least 2023.

75. Walmart operates more than a dozen Walmart-branded retail fuel stations in California. Walmart has been using Kalibrate Fuel Pricing to automate and raise prices in its stations' markets since at least 2021.

76. The Circle K Defendants operate and license more than 400 retail fuel stations in California, including in the Brawley, Chico, Los Banos, Redding, Twentynine Palms, Westmorland, and Yuba City markets. The Circle K Defendants have been using Kalibrate Fuel Pricing to automate and raise prices in their stations' markets since at least 2025.

77. The Albertsons Defendants operate more than 50 retail fuel stations in California, including in the Chico and Redding markets. The Albertsons Defendants have been using

Kalibrate Fuel Pricing to automate and raise prices in their stations' markets since at least 2009. When the Albertsons Defendants implemented Kalibrate Fuel Pricing at one California location, the price of gasoline at that location increased quickly by 3 to 4 cents per gallon as a result.

## IV. Kalibrate's Agreements with the Gas Station Defendants Constitute Illegal Trusts Under California Law

78. At all relevant times, Defendants have entered into and maintained trusts within the meaning of the Cartwright Act—a combination of capital, skill, or acts by two or more persons—for the unlawful purpose of tampering with and controlling the retail price of gasoline and diesel in California.

79. First, the Gas Station Defendants have each engaged in concerted activity with Kalibrate in violation of the Cartwright Act. Each Gas Station Defendant has combined with Kalibrate so as to replace its independent pricing decision-making with an algorithmic pricing mechanism that coordinates that Gas Station Defendant's pricing decisions with the pricing decisions of its competitors, thereby fixing, tampering, or otherwise interfering with the price of gasoline and diesel sold at the Gas Station Defendants' sites in California.

80. As explained in paragraphs 139 to 145, Kalibrate Fuel Pricing only works to achieve margins as advertised if each Gas Station Defendant allows Kalibrate to determine the optimal supracompetitive fuel price and adopts that price with little or no second guessing.

81. Kalibrate's advertising makes clear that a key value proposition of Kalibrate Fuel Pricing is its use of competitor information to maximize prices in each market by avoiding unnecessary downward price competition. Kalibrate's customers understand that in exchange for surrendering their commercially sensitive pricing, cost, and volume data to Kalibrate, and delegating their pricing decisions to Kalibrate Fuel Pricing, Kalibrate's algorithm will coordinate with other nearby gas stations to increase their profits by eliminating normal price-cutting competition which would otherwise benefit consumers. Put simply, these Kalibrate customers can safely push prices to supercompetitive levels without risking the customer loss that would otherwise make such hikes unprofitable.

82. By adhering to the price recommendations generated by Kalibrate Fuel Pricing, the Gas Station Defendants have surrendered their independent pricing authority to a third party's automated common pricing algorithm designed to maximize the price of gasoline and diesel within a market, and to impede the free interplay of competition and supply and demand among gas stations. The Gas Station Defendants' contracts with Kalibrate were entered into with the specific knowledge and expectation that Kalibrate Fuel Pricing would direct the Gas Station Defendants' own pricing systems to avoid competition. Each Gas Station Defendant purposely abdicated its independent duty to compete by entering into a trust aimed at maintaining supracompetitive prices.

83. Further, by utilizing Kalibrate Fuel Pricing to achieve and maintain supracompetitive pricing that no station would risk setting independently, the Gas Station Defendants have also combined among themselves as well as with Kalibrate to artificially inflate the price of gasoline and diesel for California consumers.

### V. Algorithmic Price Fixing, Including Defendants' Use and Distribution of Kalibrate Fuel Pricing, Is *Per Se* Illegal Under the Cartwright Act.

84. Price fixing of any stripe is *per se* illegal under the Cartwright Act, Cal. Bus. & Prof. Code § 16720.

85. The quintessential image of price fixing is a secret deal made between competitors over cigars in a smoky back room. But as technology has advanced, so too have the mechanisms available to competitors to fix prices without the cigars, the smoke, or even the room. Common pricing algorithms allow competitors to pool confidential data and generate prices based on those data without communicating with each other directly.

86. California's Assembly Bill 325 ("AB 325") was enacted to make clear that companies cannot evade liability for fixing prices by delegating their illegal trusts to an algorithm. The bill makes explicit that the prohibition on fixing prices under the Cartwright Act extends to the use of such algorithms. Effective January 1, 2026, AB 325 states that "[i]t shall be unlawful for a person to use or distribute a common pricing algorithm as part of a contract,

combination in the form of a trust, or conspiracy to restrain trade or commerce in violation of this chapter."

87. As explained by California Attorney General Rob Bonta, "AB 325 simply makes it clear that using common pricing algorithms to fix prices among competitors is just as illegal as traditional price fixing methods under the [Cartwright] Act."

88. AB 325's drafters similarly wrote: "This subdivision does not constitute a change in, but is declaratory of, existing law." At the third reading of the bill before the Assembly, arguments in support of the bill stated that "price fixing is already illegal," and that this bill is "[c]odifying that price fixing through algorithmic tools is just as illegal as traditional price fixing between competitors."

89. Kalibrate Fuel Pricing qualifies as an illegal common pricing algorithm under AB 325 as codified in California Business and Professions Code Section 16729. Kalibrate Fuel Pricing is software used by two or more persons that uses competitor data to recommend, align, stabilize, set, and influence gasoline and diesel prices.

**VI. Relevant Markets**

90. The understanding and agreement among the Gas Station Defendants and Kalibrate to use Kalibrate Fuel Pricing to raise gasoline and diesel prices, and charge more to consumers, is *per se* illegal under California law.

91. Because the conduct alleged herein increases prices and reduces output, if the Court declines to analyze this case under the *per se* rule, the Court could conduct a quick look review. For both standards Plaintiffs are not required to define a relevant antitrust market or to prove that Gas Station Defendants had market power in any defined antitrust market.

92. To the extent the Court nonetheless decides to engage in a rule of reason analysis, the relevant product markets are the retail sale of gasoline and the retail sale of diesel. The relevant geographic markets are the areas in which the Gas Station Defendants' sites are situated within California.

### *A. Product Markets*

#### *1. The Retail Sale of Gasoline Is a Relevant Product Market.*

93. Consumers need to purchase gasoline to power and use their gasoline-powered vehicles. Consumers can purchase this gasoline only at retail gas stations. Consumers cannot feasibly purchase or store gasoline in wholesale quantities. Consumers cannot use other types of fuel, such as diesel, in their gasoline-powered vehicles. Consumers with gasoline-powered vehicles cannot feasibly switch to other means of transportation in response to a small but significant price increase in the retail sale of gasoline. For example, the switching costs involved in replacing a gasoline-powered vehicle with an electric vehicle are significant. This type of switching is an expensive and time-consuming undertaking which requires a large up-front investment or financing. Public transit, on the other hand, is typically much slower and less reliable than driving in one's own vehicle and serves only limited routes at limited time periods throughout the day. Public transit therefore is not a comparable substitute for the vast majority of California consumers. As explained by the Bureau of Labor Statistics in a publication using gasoline to explain the concept of inelastic demand, gasoline "is a necessity for many daily functions and reducing consumption is difficult even when the good becomes increasingly costly. Gasoline is difficult to substitute and necessary to many citizens for daily life."[2] For consumers with gasoline-powered vehicles, no economic or practical alternative to the retail sale of gasoline exists in the event of a small but significant price increase.

94. Market participants such as fuel wholesalers, gas station operators, and the general public recognize gasoline sold at retail as a distinct product and market.

95. The market for the retail sale of gasoline is characterized by specialized vendors and unique facilities that are not interchangeable with other business types. The specialized infrastructure—including underground storage tanks, high-flow pumping hardware, and specific environmental safety systems—is unique to the retail fuel industry and carefully regulated by the State of California and federal regulators. Because these facilities cannot be easily converted to

---

[2] Eliana Eitches & Vera Crain, U.S. Bureau of Labor Statistics, *Using Gasoline Data to Explain Inelasticity*, 5 Beyond the Numbers: Prices and Spending, at 5 (Mar. 2016), https://www.bls.gov/opub/btn/volume-5/pdf/using-gasoline-data-to-explain-inelasticity.pdf.

other uses, and because general retailers cannot easily install such equipment, the retail sale of gasoline constitutes a distinct area of effective competition.

96. Additionally, gasoline possesses peculiar characteristics and uses that distinguish it from any other commodity. Gasoline is refined and chemically formulated specifically for use in internal combustion engines. This uniqueness is reflected in the distinct prices and the lack of cross-price elasticity between gasoline and other consumer goods, including other retailed oil byproducts.

97. The price of gasoline at the pump is tracked and reacted to by consumers as a standalone economic factor, independent of the pricing of other retail products like jet fuel, heating oil, or diesel. Because there is no functional substitute for the specific energy density and combustible properties of gasoline for gasoline-powered vehicles, the market exhibits the sensitivity to price changes typical of a market where consumers are unable to turn to alternative products in response to a price increase.

98. The market for the retail sale of gasoline also satisfies the test for market definition used by economists and federal antitrust enforcement agencies known as the hypothetical monopolist test. This test examines whether a hypothetical monopolist of a proposed relevant market could profitably impose a small but significant non-transitory increase in price on a product within the relevant market without causing enough customers to turn to more distant products outside the proposed relevant market and render the increase unprofitable. Here, the hypothetical monopolist test is satisfied because a monopolist in the retail sale of gasoline would not lose enough sales as the result of a small but significant non-transitory increase in price of the product to make the price increase unprofitable. The retail sale of gasoline therefore constitutes a properly defined relevant market.

***2. The Retail Sale of Diesel Is a Relevant Product Market***

99. Similar market dynamics and commercial realities support the existence of a distinct relevant product market for the retail sale of diesel. Consumers can purchase diesel only at retail gas stations. Consumers cannot feasibly purchase or store diesel in wholesale quantities. Consumers cannot use other types of fuel, such as gasoline, in their diesel-powered vehicles. For

consumers with diesel-powered vehicles, no economic or practical alternative to the retail sale of diesel exists in the event of a small but significant increase in the price of retailed diesel.

100. The retail sale of diesel is further distinguished by industry and public recognition as a distinct product and market.

101. Market participants, including fuel distributors and engine manufacturers, treat diesel as a standalone market with its own supply chain dynamics and state regulatory requirements. This distinction is reinforced by the presence of specialized vendors and infrastructure, such as high-flow diesel pumps and dedicated truck lanes at fueling stations, which are specifically designed to accommodate the high-volume needs of most diesel-powered vehicles.

102. Furthermore, diesel exhibits peculiar characteristics and uses that create a high degree of functional non-interchangeability. Because diesel engines rely on compression ignition rather than spark ignition, diesel fuel is chemically distinct and possesses a higher energy density than gasoline, making it non-interchangeable and indispensable for heavy-duty hauling and high-torque applications. This technical necessity results in distinct prices and a lack of price sensitivity relative to other fuels. For the customers who rely on diesel, the lack of viable substitutes ensures that the retail diesel market remains a distinct and legally cognizable relevant market.

103. Further, the hypothetical monopolist test confirms this commercial reality and is satisfied because a monopolist in the retail sale of diesel would not lose enough sales as the result of a small but significant non-transitory increase in price to make the price increase unprofitable. The retail sale of diesel therefore constitutes a properly defined relevant market.

***B. Geographic Markets***

104. As discussed in paragraph 91, Plaintiffs are not required to prove that Gas Station Defendants have market power in any defined antitrust market to state a claim under the Cartwright Act. Nonetheless, if required to do so, it is evident that consumers prefer to buy gasoline and diesel at gas stations near where they live or work, or along preplanned routes. Competition for the sale of gasoline and diesel is therefore local, ranging from a few blocks to a

few miles, depending on unique local circumstances. Consumers do not consider distant gas stations as substitutes for their local gas stations. For one thing, the fuel costs associated with driving to a distant station will quickly erase any marginal savings from buying cheaper gasoline or diesel.

105. Kalibrate and the Gas Station Defendants operate across the State of California. The Gas Station Defendants sell gasoline and diesel throughout California, and Kalibrate coordinates their pricing of both products across California. However, given the localized nature of competition for the retail sale of gasoline and diesel, localized markets around the Gas Station Defendants' sites within California are relevant geographic markets in which to evaluate the effects of Defendants' conduct. A hypothetical monopolist of any of these local markets could profitably impose a small but significant non-transitory increase in price at one retail outlet within a given local relevant geographic market without causing enough consumers to turn to gas stations outside of that proposed market to render the price increase unprofitable.

### *C. Market Shares in Relevant Markets*

106. Courts often use market share as a rough proxy for market power. Below is a non-exhaustive list of geographic locations within California containing local markets where the Gas Station Defendants possess market power, as evidenced in part by their significant collective market shares in those local markets:

**Figure 1: Representative Gasoline Geographic Markets**

| **Region** | **Percentage of Market Controlled by Gas Station Defendants** | **Description** |
|---|---|---|
| Brawley | 36.36% | Small city near the Mexico border |
| Chico | 27.27% | Small city in the Sacramento Valley |
| Los Banos | 26.67% | Urban neighborhood surrounded by rural land |
| Magalia | 25% | Small unincorporated community |
| Marina | 28.57% | Small coastal city |
| Redding | 25.58% | Small city in Cascade region |

| | | |
|---|---|---|
| Twentynine Palms | 42.86% | Small city on the edge of the desert |
| Westmorland | 25% | Small town in the El Centro Metropolitan Area |
| Yuba City/Marysville | 34.38% | Medium-sized town |

**Figure 2: Representative Diesel Geographic Markets**

| **Region** | **Percentage of Market Controlled by Gas Station Defendants** | **Description** |
|---|---|---|
| Brawley | 40% | Small city near the Mexico border |
| Chico | 28% | Small city in the Sacramento Valley |
| Los Banos | 35.71% | Urban oasis in rural area |
| Magalia | 25% | Small unincorporated community |
| Marina | 33.33% | Small coastal city |
| Redding | 26.19% | Small city in Cascade region of northern California |
| Westmoreland | 50% | Small town in the El Centro Metropolitan Area |

107. An example of such a local gasoline market is Yuba City/Marysville, a California retail market depicted in Figure 3. This market is situated in northern California and is located 40 miles north of Sacramento in the Sacramento Valley. It sits at the intersection of state highway 20 running east-west and highways 65, 70, and 99 running north-south, making it a major hub for travelers in northern California. There are 32 gas stations in this relevant market. Of the 32 gas stations, 11 are locations controlled by the Gas Station Defendants, which are depicted in orange in the map below:

**Figure 3: Yuba City/Marysville Geographic Market**




## VII. Several Plus Factors Reinforce the Existence of a Combination in Restraint of Trade Among the Gas Station Defendants

### *A. High Barriers to Entry*

108. Significant barriers exist for businesses seeking to enter and compete in markets for the retail sale of gasoline or diesel. These barriers include the sparse availability of attractive real estate, as well as the time and cost associated with building a new gas station and obtaining the necessary permits and approvals. Building a new gas station can cost several million dollars. Site selection, permitting, design, and construction can take years.

109. And as detailed in paragraphs 95, 98, 101, 103, and 105 a new entrant is unlikely to offset price increases in the retail sale of gasoline or diesel caused by Defendants' anticompetitive conduct.

### *B. Fungible Product Subject to Inelastic Demand*

110. Gasoline and diesel are fungible commodities. The product characteristics of gasoline are largely uniform, and without lab testing it is not possible to differentiate gasoline manufactured, sold, or distributed by a given entity; the same is true for diesel. Though certain

gasoline or diesel brands may seek to differentiate themselves through branding, gasoline and diesel are refined, sold, transported, and blended in large quantities. A gasoline-powered vehicle can readily use the gasoline of any gasoline brand and, with very limited exceptions such as high-performance sports cars, every type of gasoline. A diesel-powered vehicle can readily use the diesel of any diesel brand. Though certain additives may be mixed with gasoline or diesel to satisfy engine specifications or emissions standards, these additives are standardized across suppliers in California and do not affect the fungible nature of gasoline or diesel.

111. Demand for the retail sale of gasoline and diesel is inelastic. Most people in the United States use gasoline-powered automobiles as their primary form of transportation. As explained by the Bureau of Labor Statistics in a publication using gasoline to explain the concept of inelastic demand, gasoline "is a necessity for many daily functions and reducing consumption is difficult even when the good becomes increasingly costly. Gasoline is difficult to substitute and necessary to many citizens for daily life." The same is true with respect to consumers who drive diesel-powered vehicles.

### *C. Motive, Opportunity, and Invitation to Collude*

112. Kalibrate's own marketing materials explain the company's and the Gas Station Defendants' motive and opportunity to collude, and Kalibrate invites potential customers, including the Gas Station Defendants, to use Kalibrate Fuel Pricing to implement this collusion.

113. In its marketing materials, Kalibrate explains to gas station operators that they can use Kalibrate Fuel Pricing to increase their margins by coordinating to avoid price wars with their competitors. Kalibrate warns potential customers that if they do not use Kalibrate Fuel Pricing to avoid price cutting competition with their competitors, they may be needlessly "sacrificing margin in an attempt to draw volume." Even worse, Kalibrate warns that potential customers who choose to compete on price "could be making a change that triggers a downward spiral and has negative implications for everyone operating in that market." Kalibrate tells potential customers: "Your competitors look to you to set the prices and will just modify their prices accordingly."

114. Kalibrate offers Kalibrate Fuel Pricing as a solution, a tool that it enables its customers to stop needlessly competing with one another on price and to instead work cooperatively to keep their prices high to "squeeze out profit" from consumers. Beyond using Kalibrate Fuel Pricing to collaborate to avoid competition and the accompanying price cutting, Kalibrate even showcases in its marketing materials an ability within Kalibrate Fuel Pricing to initiate or follow a "restoration," a phenomenon where nearly all gas stations in a market raise their prices contemporaneously and by a large amount.

115. In sum, Kalibrate warns gas station operators that they will lose money and margin by competing with other market participants, and markets Kalibrate Fuel Pricing as a method to collude to avoid price cutting and even raise prices. This constitutes a clear invitation to collude, and this collusion to avoid price competition is central to delivering Kalibrate Fuel Pricing's value proposition.

116. Kalibrate's Fuel Pricing customers—including the Gas Station Defendants—understand that by contracting with Kalibrate, they are purchasing access to a system that will provide them with full visibility into their competitors' pricing and sales, allow them to stop competing vigorously on price with their competitors, and even let them coordinate market-wide price increases with their competitors. These competition-eliminating features are the core value proposition of Kalibrate Fuel Pricing. Absent these collusive outcomes, it would make no sense to pay what Kalibrate charges for Kalibrate Fuel Pricing, since Kalibrate itself has acknowledged that using Kalibrate Fuel Pricing merely to automate pricing will not achieve meaningful margin increases offered by the software. Kalibrate's Fuel Pricing customers—including the Gas Station Defendants—accept Kalibrate's invitation to collude when they sign on to delegate their pricing decisions to Kalibrate Fuel Pricing so that Kalibrate can raise their prices and their competitors' prices together.

### *D. Actions Against Self-Interest Explained Only by the Existence of a Trust*

117. The Gas Station Defendants each have acted in ways that would be against their independent economic self-interest in the absence of collusion. Simply put, no Gas Station Defendant would hand over the keys for their pricing, inventories, volumes, and sales to a third

party like Kalibrate who promises to compete less intensely with other area gas stations unless it knew that same third party was also promising that the gas station's competitors would not undercut it. This is the essence of an action against self-interest in which Defendants would not engage in the absence of an unlawful trust.

118. The Gas Station Defendants similarly provide their confidential, competitively sensitive information for ingestion into Kalibrate's Pricing Cloud. Kalibrate publicizes that it uses its vast array of competitor data to power Kalibrate Fuel Pricing's algorithms. The Gas Station Defendants would not provide their confidential information to a pricing company such as Kalibrate that also powers pricing decisions for competing gas stations in the absence of collusion. But the Gas Station Defendants understand that through Kalibrate Fuel Pricing, their confidential information will be used in conjunction with the confidential information of competitors to facilitate market-wide price increases and the end of true price competition.

***1. Maintaining Elevated Prices***

119. In a competitive, well-functioning market, the Gas Station Defendants would reduce the retail price of their fuel down toward their costs to attract consumers from their competitors' gas stations and win market share. Kalibrate itself acknowledges this 'natural' state of competition in its marketing materials: "[I]f you decide to drop your prices in an effort to drive high volume over a short space of time, you might enjoy a momentary uplift while the rest of the market catches up . . . ."

120. In a competitive market, it would be against each Gas Station Defendant's self-interest to keep their prices high and refrain from vigorous price competition with other gas stations, because they would lose customers to price-cutting competitors.

121. However, Kalibrate tells its customers that they can keep prices high by colluding. An investigator's affidavit from the ongoing investigation into Kalibrate by Canada's Department of Justice wrote: "Kalibrate markets its pricing services as a way for gas stations to increase their margins and avoid price wars." Kalibrate tells its customers not to cut prices as would be in their independent economic self-interest, because through concerted action they can earn higher profits.

122. Kalibrate's approach to retail gasoline and diesel pricing makes sense only as part of an illegal agreement to restrain price competition.

123. Joining in the collusion among users of Kalibrate Fuel Pricing is key to the service's main value proposition. Kalibrate's marketing materials make clear Kalibrate Fuel Pricing enables customers to delegate their pricing decisions to Kalibrate's algorithm, coordinate higher prices with other gas stations in their markets, and deprioritize chasing volume through lower prices in favor of colluding to charge consumers more for gasoline or diesel at the pump.

124. When Kalibrate's customers, including the Gas Station Defendants, sign up to use Kalibrate Fuel Pricing, they understand that they are joining a system that uses a common pricing algorithm to coordinate price increases with their competitors in the market. This collusion is not merely a niche feature of Kalibrate Fuel Pricing; collusion is its main purpose and value proposition. Kalibrate acts as a single pricing decision-maker for its customers, including the Gas Station Defendants. The Gas Station Defendants understand that ceding their pricing to Kalibrate and allowing Kalibrate Fuel Pricing to reduce price competition with competing stations is key to achieving the margin gains Kalibrate advertises.

125. One Kalibrate executive confirmed in an interview that if a gas station merely uses Kalibrate Fuel Pricing to streamline its pricing operations, the station will not see the full return on investment offered by the pricing algorithm: "Starting to use smart analytics and optimization is where you really make the big bucks. Now, if all you're interested in is the operational efficiencies, in other words, getting prices from the point of decision to the pump, POS and price sign, then the [return on investment] might take a little longer . . . ." But, when gas stations surrender their prices to Kalibrate Fuel Pricing and its competitor-led fuel pricing decisions, they can exploit their "pricing power" such that the increases in their margins will pay for the three-year subscription well within the first year of using the software—sometimes even within the first two months.

126. By delegating all or the vast majority of their pricing decisions to Kalibrate, the Gas Station Defendants use Kalibrate Fuel Pricing as the tool to maintain high prices that would drive customers away and would be against their independent economic self-interests in a

competitive market. Their use of Kalibrate Fuel Pricing to maintain high prices makes sense only if other area competitors—including the Gas Station Defendants—collude together to keep prices high by declining to compete.

### *2. Exchange of Competitively Sensitive Information*

127. Kalibrate Fuel Pricing requires customers to provide it with their sensitive, non-public information. For example, the Gas Station Defendants provide Kalibrate not only their confidential historical gasoline and diesel sale costs and volumes, but also their commercially sensitive and non-public forward-looking planned and forecasted costs and volumes. The Gas Station Defendants similarly share with Kalibrate their confidential, commercially sensitive past and planned margins.

128. Kalibrate's documentation makes clear that each customer's data is fed into its central, multi-tenant Pricing Cloud:




129. Once ingested into the Pricing Cloud, Kalibrate uses its customers' confidential historical and forward-looking data, in combination with additional vast proprietary and commercial datasets, to automatically set retail gasoline and diesel prices at the Gas Station Defendants' stations.

130. Kalibrate has at times stated in response to inquiries that Kalibrate Fuel Pricing for each customer is "exclusively based on data entered by that individual customer." However, these statements are flatly contradicted by Kalibrate's own promotional materials. Elsewhere, Kalibrate boasts that it "collects raw data from over 6000 sources" and that is has assembled "[v]ast, far-reaching fuel retail data sets" to power its algorithms. In advertising that Kalibrate Fuel Pricing enables its customers to make "competitor-led fuel pricing decisions," Kalibrate offers gas stations "complete visibility on your competitors." Kalibrate's website includes testimonials from customers raving about how the information Kalibrate provides about competing gas stations allows its customers to maximize their own profits. In product demos, Kalibrate also has shown potential customers the confidential, non-public, competitively sensitive information of competing gas stations—including non-public, competitively sensitive fuel sales volumes—that Kalibrate would make available to them.

131. Similarly, a senior officer for Canada's Department of Justice found in their pending investigation of Kalibrate's anticompetitive conduct: "[T]he Commissioner has reason to believe that Kalibrate collects competitively sensitive information related to price, cost and output from motor fuel retailers (competitors commonly referred to as 'gas stations')" and uses this data to "produce[] pricing guidance for them."

132. Absent collusion, it would make no sense and would be against each Gas Station Defendant's self-interest to provide non-public, commercially sensitive price, volume, margin, and other data to a software company that also sets prices for its competitors, particularly where that software company itself acknowledges that the benefit of the software is limited if it is used only to streamline fuel pricing. However, because Kalibrate Fuel Pricing uses this data to help its customers coordinate to avoid competing on price, the benefits of being able to collude to charge higher prices outweigh the risk to the Gas Station Defendants of sharing this competitively sensitive information with one's closest competitors.

### *E. Kalibrate Fuel Pricing Is the Subject of Government Investigation*

133. The use of Kalibrate Fuel Pricing as a tool to fix prices is also the subject of an ongoing government investigation. Canada's Department of Justice commenced an inquiry into

Kalibrate Fuel Pricing in 2024. In an affidavit supporting an investigatory subpoena, a senior investigator wrote: "[T]he Commissioner has reason to believe that . . . Kalibrate[] guides retail motor fuel prices . . . and that this conduct has had, is having or is likely to have the effect of preventing or lessening competition . . . . Further, the Commissioner has reason to believe that Kalibrate collects competitively sensitive information related to price, cost and output from [gas stations], produces pricing guidance for them using artificial intelligence, machine learning, algorithms, and bespoke consulting services such that competition is likely substantially prevented or lessened . . . ."

## VIII. Defendants' Use of Kalibrate Fuel Pricing Has Increased Gasoline and Diesel Prices in Local Markets and Across California

134. Kalibrate Fuel Pricing has had its intended purpose of restraining competition and allowing the Gas Station Defendants to raise prices. By stifling the price-cutting retail competition that previously characterized local gasoline and diesel markets, Defendants eliminated the competitive dynamic that historically drove local retail prices down.

135. A growing body of literature reflects that when retailers delegate their pricing to algorithmic pricing tools like Kalibrate Fuel Pricing, market prices trend higher, toward monopoly prices.[3] Research has shown that where multiple gas stations in a market use common pricing algorithms, price undercutting among competitors evaporates, gas station margins expand, and market-wide fuel prices can increase as much as 30 cents per gallon.

136. The assertion that algorithmic pricing fundamentally alters market competition is not merely a theoretical concern; it is an empirically documented reality. In the seminal study on the topic, Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market ("German Study"), researchers provided the first large-scale analysis of how this technology impacts fuel margins.[4]

---

[3] *See, e.g.*, Leon Musolff, *Algorithmic Pricing, Price Wars and Tacit Collusion: Evidence from E-Commerce* 27 (Dec. 16, 2025), https://lmusolff.com/papers/Algorithmic_Pricing.pdf.

[4] Stephanie Assad, et al., *Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market*, 132 J. Polit. Econ. 723 (2024).

137. By examining a high-frequency database of retail gas stations in Germany, the study found that the adoption of algorithmic pricing software leads to a significant and measurable increase in retail prices and margins at stations using algorithmic pricing tools, including Kalibrate Fuel Pricing.

138. Specifically, the study concluded that after adopting such software, mean station-level margins increased by approximately 15%. This real-world evidence confirms that when fuel retailers outsource their pricing to common pricing algorithms, the primary result is a systematic transfer of wealth from consumers to gas station owners.

139. The study's most alarming findings relate to how these algorithms affect competition. The researchers discovered that the impact on margins of adopting such algorithms is directly tied to the intensity of competition that existed in the market *before* the use of the algorithms. While pre-existing monopolists saw no significant change in their margins, stations that historically faced competition from rivals saw a pronounced increase in margins. Most notably, in markets where stations adopting algorithmic pricing software like Kalibrate Fuel Pricing competed head-to-head, margins increased by 38% when both stations adopted the software.

140. This observation demonstrates that the strong appeal and key value proposition of Kalibrate Fuel Pricing's algorithm lies in its ability to neutralize preexisting retail competition by ensuring that no rival has an incentive to lower prices.

141. Using the algorithms, the gas stations were able to coordinate and signal high prices in ways that humans are unable to do without communications that would violate anti-cartel statutes.

142. The German Study's conclusions are consistent with Kalibrate's public statements and the success of the Gas Station Defendants in increasing their margins. Where preexisting monopolists were already extracting monopoly profits before switching to algorithmic pricing tools, the study did not find an appreciable increase in margins. For these monopolists, the algorithmic pricing tools functioned only to streamline operations. In an interview, a Kalibrate

executive similarly noted that using Kalibrate Fuel Pricing merely to streamline a gas station's pricing will not achieve the potential margin gains from the software.

143. Rather, like the algorithmic pricing software in the German Study that juiced up gas station profits by eliminating competition, the core value proposition of Kalibrate Fuel Pricing lies in its ability to eliminate competition in formerly competitive markets.

144. In that same interview, the Kalibrate executive explained that Kalibrate is most effective in growing profits when it helps its customers to leverage their "pricing power." As described at section II.B *supra*, Kalibrate Fuel Pricing enables its customers to exercise their pricing power by collectively deciding not to compete on price, and in some cases—for example, with regard to restorations—even agreeing to raise prices together.

145. On its website, Kalibrate provides customer testimonials about how it has succeeded in this mission: "We have experienced an improvement in margins since implementing Kalibrate Fuel Pricing."

146. Kalibrate even advertises that Kalibrate Fuel Pricing will increase margins and total profits for its users by raising prices while selling fewer gallons overall. In one brochure, Kalibrate offers an example of how following its anticompetitive fuel strategy "would result in a volume decrease of -2.2% — but a **total profit increase of $587 per site per week.**" (emphasis in original.) Increasing price while reducing volume is stark evidence of the anticompetitive effect of Kalibrate Fuel Pricing. *See* Cal. Bus. & Prof. Code § 16720(b) ("A trust is a combination of capital, skill or acts . . . [t]o limit or reduce the production, or increase the price of merchandise or of any commodity.").

147. In a state where even a one-cent increase at the pump costs drivers over $134 million annually, the surcharge resulting from Gas Station Defendants' use of Kalibrate Fuel Pricing to set gasoline and diesel prices represents a multi-billion dollar drain on the California economy.

148. Californians already face gas prices higher than in the rest of the United States. Since roughly 2015, gasoline prices in California have been 40 to 50 cents per gallon higher than can be explained by input costs such as the price of crude oil or regulation and taxes. In other

words, a significant factor of high prices at the pump results from industry players at the retail level making the conscious decision to charge higher prices than they are able to obtain in other parts of the country.

149. Since the beginning of the 2026 war in Iran, California gasoline and diesel prices have spiked even higher. In March 2026, the California Energy Commission (CEC) Division of Petroleum Market Oversight announced that it was monitoring gasoline prices above as much as $7.00 per gallon. Like the California Mystery Gasoline Surcharge, "[t]hese extraordinarily high prices are not supported by current crude oil prices or gasoline futures." Kalibrate's marketing materials help to understand one reason why gasoline and diesel prices are higher than can be explained by world events and market forces: Kalibrate tells its users how Kalibrate Fuel Pricing can help them to maximize their profits during these fuel crises, exacerbating California's already sky-high fuel prices.

150. Though Kalibrate and the Gas Station Defendants are understandably secretive about the full extent of the price hikes they have been able to achieve on retail gasoline and diesel sales using Kalibrate Fuel Pricing in California, Kalibrate's marketing materials and certain public materials make clear that Defendants have in fact succeeded in using Kalibrate to raise fuel prices and margins to supracompetitive levels.

151. The TravelCenters Defendants boasted in one investor presentation that adopting Kalibrate Fuel Pricing allowed them to increase margins by more than $1.00 per gallon at certain sites.

152. Publicly available materials similarly reflect that the Albertsons Defendants' gasoline and diesel prices increased significantly—in one California market, increasing quickly by 3 to 4 cents per gallon—after implementing Kalibrate Fuel Pricing.

153. Based on an understanding of the effects of algorithmic retail fuel pricing as illustrated through the German Study, the mean overcharge for gasoline in California for the Gas Station Defendants' stations using Kalibrate Fuel Pricing is roughly 6 cents per gallon. The price increase is much more pronounced in areas where a high proportion of gas stations have adopted

Kalibrate Fuel Pricing, as high as 30 cents per gallon of gasoline and 33 cents per gallon for diesel.

154. Moreover, when the Gas Station Defendants use Kalibrate Fuel Pricing to raise prices, it not only affects pricing at their individual stations—it also results in a softening of retail fuel competition across the markets where they do business. This results in higher gasoline and diesel prices for all consumers—not just the ones who buy fuel at the Gas Station Defendants' locations. The market-wide price increases that result from the Gas Station Defendants' use of Kalibrate Fuel Pricing is an intentional result of the software's operation, placing every consumer who purchased fuel in an area where Kalibrate Fuel Pricing is in use directly within the zone of foreseeable injury of Defendants' conduct.

155. The use of Kalibrate Fuel Pricing by multiple gas stations within a given geographic area exacerbates the anti-competitive effects of Defendants' unlawful conduct. When multiple competitors in an area surrender their pricing to Kalibrate Fuel Pricing, the algorithm effectively lifts the pricing floor for that entire territory. This localized manipulation forces up retail prices across all area distribution outlets, meaning that a Gas Station Defendant's use of Kalibrate Fuel Pricing will cause higher prices even for consumers who purchase from other gas stations. When Kalibrate advertises that its software is used by a "8 of the top 10 fuel retailers in the USA," and 14 of the top 20 convenience store chains, it is communicating to potential customers that they too can benefit from Kalibrate's broad presence and amplify the effects of Kalibrate Fuel Pricing in their markets. Kalibrate's geographic saturation functions as a substantial factor in driving these market-wide overcharges, directly harming every consumer who buys fuel from any gas station within these locales, whether from a particular Gas Station Defendant or another area station.

156. Absent Court intervention, areas across California will continue to operate as no-competition zones, draining the budgets of California drivers already feeling the pain at the pump. Because consumers are rooted in their local communities and bound by their geography, commuting daily to work and school, they have no choice but to continue making purchases in these rigged markets. The Court must enjoin this conduct to restore the fundamental right of

every Californian to benefit from honest, free competition on the street corners of their local communities.

**IX. Defendants' Anticompetitive Conduct Has Harmed Plaintiffs**

157. Plaintiffs each have paid higher prices at the pump as a direct result of Defendants' use of Kalibrate Fuel Pricing to set retail gasoline and diesel prices.

158. Plaintiff Joel Casciani has regularly purchased gasoline for his car and motorcycle at ARCO gas stations in Chula Vista, CA, where he paid inflated prices due to the Gas Station Defendants' use of Kalibrate Fuel Pricing in that area. Mr. Casciani works with aviation programs in Coronado, CA, but the increased cost of gasoline for his daily commute has financially burdened him.

159. Plaintiff Paola Hartman has regularly purchased gasoline from the Circle K Defendants in Perris, CA, where she paid inflated prices due to the Gas Station Defendants' use of Kalibrate Fuel Pricing in that area. Ms. Hartman dedicated her career to serving her local community as a former paraprofessional in special education, but she now experiences unsustainably increased costs for gasoline.

160. Plaintiff Travis McMichael has regularly purchased diesel for both personal and professional use from the Circle K Defendants in Lake Elsinore, CA, where he paid inflated prices due to the Gas Station Defendants' use of Kalibrate Fuel Pricing in that area. Inflated diesel prices have taken away resources that he would otherwise spend on his children or other utilities.

161. Plaintiff Ernest Scoggan regularly purchases gasoline from ARCO stations in Palmdale, CA, where he paid inflated prices due to the Gas Station Defendants' use of Kalibrate Fuel Pricing in that area. Mr. Scoggan retired in 2020, having previously worked as a delivery driver for a water company. Now, driving is integral to his lifestyle, as he relies on his car to engage in activities and make regular trips to his local senior center. However, as a retiree living on a fixed income, he is substantially affected by high prices at the pump.

162. Plaintiff Crystal Turnbough has regularly purchased gasoline from a BP-affiliated ARCO gas station in Yuba City, CA, and the Walmart Fuel & Convenience Store in Marysville,

CA, where she paid inflated prices due to the Gas Station Defendants' use of Kalibrate Fuel Pricing in that area. As a Restorative Nurse Aide, Ms. Turnbough is committed to rehabilitating and caring for her patients, but increased gasoline costs have rendered her commute to work financially burdensome.

## X. Class Allegations

163. Plaintiffs Joel Casciani, Paola Hartman, Ernest Scoggan, and Crystal Turnbough bring this action for themselves and as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> **Gasoline Class:** All persons and entities who purchased gasoline at any of the Gas Station Defendants' gas stations in California where Kalibrate Fuel Pricing was in use from and including June 22, 2022 to the present (the "Class Period").

164. Plaintiff Travis McMichael brings this action for himself and as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> **Diesel Class:** All persons and entities who purchased diesel at any of the Gas Station Defendants' gas stations in California where Kalibrate Fuel Pricing was in use during the Class Period.

165. Specifically excluded from each Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf. Also excluded from the Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, all State agencies; and any juror assigned to this action.

166. The Classes are each so numerous as to make joinder impracticable. While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are millions of geographically dispersed members in each Class.

167. Plaintiffs' claims are typical of the claims of the members of each Class. Plaintiffs and Class Members sustained damages arising out of Defendants' common course of conduct in

violation of the laws alleged herein. Because the core of this action centers on an algorithmic pricing conspiracy orchestrated through Kalibrate to systematically inflate retail fuel prices for all gas stations using Kalibrate Fuel Pricing, the financial injury inflicted upon the representative Plaintiffs is similar in nature to the injury suffered by every other member of the Classes.

168. Plaintiffs' claims arise out of the same course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust litigation.

169. Common questions of law and fact exist as to all members of the Classes. Plaintiffs and the Classes were injured by the same unlawful anticompetitive trust, Defendants' anticompetitive conduct is generally applicable to all members of the Classes, and relief to each Class as a whole is appropriate. Such questions of law and fact common to the Classes include, but are not limited to:

- Whether Defendants entered into a formal or informal combination, conspiracy, common understanding, or trust to suppress competition and inflate prices for the retail sale of gasoline and/or diesel;
- If Defendants entered into such formal or informal combination, conspiracy, common understanding, or trust, whether that conduct violates California's Cartwright Act under the *per se*, quick look, or rule of reason modes of analysis;
- If Defendants entered into such formal or informal combination, conspiracy, common understanding, or trust, whether that conduct has artificially inflated the retail price of gasoline or diesel to supracompetitive levels;
- Whether the operation of Kalibrate Fuel Pricing and its algorithmic use of competitor data restrained price competition in the retail sale of gasoline and diesel;
- Whether retail gasoline and retail diesel are relevant product markets;
- The appropriate injunctive and related equitable relief; and
- The appropriate measure of classwide damages.

170. The questions of law and fact common to the members of each Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

171. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

172. The prosecution of separate actions by individual members of each Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## VIOLATIONS ALLEGED

## COUNT ONE

***Trust for the Prevention of Competition in the Retail Sale of Gasoline in Violation of the California Cartwright Act (Cal. Bus. & Prof. Code Section 16720, et seq.)***

173. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 172 as though fully set forth herein. Defendants' use of Kalibrate Fuel Pricing as a vehicle for gasoline price manipulation constitutes a *per se* violation of California Business and Professions Code Sections 16720 and 16729(a).

174. Defendant Kalibrate has entered into contracts, combinations, trusts, and/or agreements with the Gas Station Defendants for the purpose and with the effect of preventing competition and artificially inflating, fixing, raising, and stabilizing the price of retail gasoline within the State of California.

175. The Gas Station Defendants have entered and maintained a conspiracy—a coordinated trust—to fix, raise, and stabilize retail gasoline prices. This agreement among

competitors is evidenced by the Gas Station Defendants' conscious commitment to common and collusive algorithmic pricing software, Kalibrate Fuel Pricing, with the shared understanding that their competitors were doing the same. By plugging their pricing into Kalibrate Fuel Pricing, as well as providing this centralized pricing agent with their competitively sensitive pricing, volume, and other data, the Gas Station Defendants replaced independent, street-corner competition with an illegal, coordinated, automated pricing system to stop competing on price, and to fix and raise prices in tandem. This conscious use of the software to lessen competition is the common binding link which connects each of the Gas Station Defendants in this trust.

176. Additionally, each individual agreement between Kalibrate and each Gas Station Defendant constitutes an unlawful trust and an agreement to tamper with or fix prices. In these individual agreements, the Gas Station Defendants have provided proprietary, non-public, competitively sensitive price, volume, and other data, and have surrendered as much as 90% of their pricing decisions to Kalibrate's centralized pricing platform. Kalibrate in return provides the Gas Station Defendants with the certainty necessary to anticompetitively raise prices without fearing the loss of customer volume.

177. Kalibrate distributes and Kalibrate and the Gas Station Defendants use a common pricing algorithm within the meaning of the Cartwright Act. By utilizing this common pricing algorithm, Defendants have replaced independent competitive decision-making with a centralized, coordinated pricing mechanism.

178. As a direct result of these competitor agreements and individual contracts, combinations, trusts, and/or agreements, competition in the California retail gasoline market has been restrained, and prices have been maintained at supracompetitive levels.

179. Plaintiffs Joel Casciani, Paola Hartman, Ernest Scoggan, and Crystal Turnbough and members of the Gasoline Class have been forced to pay an illegal surcharge at the pump as a result of Defendants' conduct, causing them significant economic injury.

## COUNT TWO

***Trust for the Prevention of Competition in the Retail Sale of Diesel in Violation of the California Cartwright Act (Cal. Bus. & Prof. Code Section 16720, et seq.)***

180. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 172 as though fully set forth herein. Defendants' use of Kalibrate Fuel Pricing as a vehicle for diesel price manipulation constitutes a *per se* violation of California Business and Professions Code Sections 16720 and 16729(a).

181. Defendant Kalibrate has entered into contracts, combinations, trusts, and/or agreements with the Gas Station Defendants for the purpose and with the effect of preventing competition and artificially inflating, fixing, raising, and stabilizing the price of retail diesel within the State of California.

182. The Gas Station Defendants have entered and maintained a conspiracy—a coordinated trust—to fix, raise, and stabilize retail diesel prices. This agreement among competitors is evidenced by the Gas Station Defendants' conscious commitment to common and collusive algorithmic pricing software, Kalibrate Fuel Pricing, with the shared understanding that their competitors were doing the same. By plugging their pricing into Kalibrate Fuel Pricing, as well as providing this centralized pricing agent with their competitively sensitive pricing, volume, and other data, the Gas Station Defendants replaced independent, street-corner competition with an illegal, coordinated, automated pricing system to stop competing on price, and to fix and raise prices in tandem. This conscious use of the software to lessen competition is the common binding link which connects each of the Gas Station Defendants in this trust.

183. Additionally, each individual agreement between Kalibrate and each Gas Station Defendant constitutes an unlawful trust and an agreement to tamper with or fix prices. In these individual agreements, the Gas Station Defendants have provided proprietary, non-public, competitively sensitive price, volume, and other data, and have surrendered as much as 90% of their pricing decisions to Kalibrate's centralized pricing platform. Kalibrate in return provides the Gas Station Defendants with the certainty necessary to anticompetitively raise prices without fearing the loss of customer volume.

184. Kalibrate distributes and Kalibrate and the Gas Station Defendants use a common pricing algorithm within the meaning of the Cartwright Act. By utilizing this common pricing algorithm, Defendants have replaced independent competitive decision-making with a centralized, coordinated pricing mechanism.

185. As a direct result of these competitor agreements and individual contracts, combinations, trusts, and/or agreements, competition in the California retail diesel market has been restrained, and prices have been maintained at supracompetitive levels.

186. Plaintiff Travis McMichael and members of the Diesel Class have been forced to pay an illegal surcharge at the pump as a result of Defendants' conduct, causing them significant economic injury.

**COUNT THREE**

***Unfair Competition in Violation of the California Unfair Competition Law – Unlawful and Unfair Prongs (Cal. Bus. & Prof. Code Section 17200, et seq.)***

187. Plaintiffs restate, reallege, and incorporate by reference each of the allegations in paragraphs 1 through 172 as though fully set forth herein.

188. Defendants have engaged in unlawful and unfair business acts or practices within the meaning of California Business and Professions Code Section 17200 ("UCL").

189. Defendants' conduct constitutes an unlawful business practice because it violates the Cartwright Act, including but not limited to Sections 16720(b), (c), (d) and Section 16729.

190. Defendants' conduct constitutes an unfair business practice under the UCL. Defendants' use of a common pricing algorithm to align retail gasoline and diesel prices is conduct that threatens an incipient violation of an antitrust law, violates the policy and spirit of the Cartwright Act, and constitutes an unfair method of competition.

191. Defendants' conduct significantly threatens to harm competition in the retail gasoline and diesel markets; has potential anticompetitive effects comparable to a violation of the antitrust laws such that it threatens to artificially stabilize and increase gasoline prices; and substitutes independent, competitive pricing decisions with a coordinated, algorithmic

mechanism, thereby subverting the legislatively declared policy of maintaining independent centers of competitive decision-making in markets throughout the state of California.

**REQUEST FOR RELIEF**

192. Wherefore, Plaintiffs, on behalf of themselves and classes of all others similarly situated, respectfully request that the Court enter an order or judgment against Defendants including the following:

a. For certification of this proceeding as a class action;

b. That Defendants' conduct be adjudged and decreed to violate the laws alleged herein;

c. That Plaintiffs and the Class Members recover compensatory and treble damages;

d. For disgorgement and restitution to Plaintiffs and the Classes;

e. For attorneys' fees to Plaintiffs and the Classes;

f. For costs and expenses as provided by law;

g. For permanent injunctive relief to Plaintiffs and the Classes;

h. For pre- and post-judgment interest upon each of the foregoing; and

i. For all other such relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

193. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Complaint so triable.

Dated: August 21, 2026

Respectfully Submitted,

/s/ Constantine P. Economides

Constantine P. Economides (CBN 363454)
ceconomides@dynamisllp.com
**DYNAMIS LLP**
1 SE 3rd Avenue, Suite 1000
Miami, FL 33131
(305) 985-2959

Ryan Class (*pro hac vice*)
rclass@dynamisllp.com
Michael B. Homer (*pro hac vice*)
mhomer@dynamisllp.com
**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 802-9157

Nicolas Stebinger (*pro hac vice*)
nicolas@simonsensussman.com
**SIMONSEN SUSSMAN LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 384-3130

Shaoul Sussman (*pro hac vice*)
shaoul@simonsensussman.com
Paul Goodrich (*pro hac vice*)
paul.goodrich@simonsensussman.com
Victoria Field (*pro hac vice*)
victoria.field@simonsensussman.com
**SIMONSEN SUSSMAN LLP**
307 West 38th Street, 16th Floor
New York, NY 10018
(646) 400-6652

*Counsel for Plaintiffs Joel Casciani, Paola Hartman, Travis McMichael, Ernest Scoggan, and Crystal Turnbough*