GIBSON, DUNN & CRUTCHER LLP
BENJAMIN WAGNER, SBN 163581
BWagner@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5395
Facsimile: 650.849.5095

THEANE EVANGELIS, SBN 243570
TEvangelis@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7420

RACHEL S. BRASS, SBN 219301
RBrass@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
JKleinbrodt@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8293
Facsimile: 415.393.8306

*Attorneys for Defendants*
*Albertsons Companies, Inc. and*
*Albertsons Safeway LLC*
(additional counsel on signature pages)

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

JOEL CASCIANI, PAOLA HARTMAN, TRAVIS MCMICHAEL, ERNEST SCOGGAN, and CRYSTAL TURNBOUGH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KALIBRATE PRICING INC., 7-ELEVEN, INC., SPEEDWAY LLC, EG RETAIL (AMERICA), LLC, BP PRODUCTS NORTH AMERICA INC., TRAVELCENTERS OF AMERICA INC., TA OPERATING LLC, WALMART INC., CIRCLE K STORES INC., TMC FRANCHISE CORPORATION, ALBERTSONS COMPANIES, INC., ALBERTSONS SAFEWAY LLC, and DOE CORPORATIONS 1-10,

Defendants.

Case No. 2:26-cv-02211-DAD-CSK

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

| | |
|---|---|
| Hearing Date: | To be set |
| Time: | To be set |
| Place: | Courtroom 4, 15th Floor |
| Judge: | Hon. Dale A. Drozd |
| Action Filed: | June 22, 2026 |

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:** PLEASE TAKE NOTICE that on such time as the Court shall order, in Courtroom 4 of the above-titled Court, Defendants Kalibrate Pricing Inc., 7-Eleven, Inc., Speedway LLC, EG Retail (America), LLC, BP Products North America Inc., TravelCenters of America Inc., TA Operating LLC, Walmart Inc., Circle K Stores Inc., TMC Franchise Corporation, Albertsons Companies, Inc., and Albertsons Safeway LLC (together, "Defendants") will and hereby make the following motion.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants respectfully move this Court to dismiss Plaintiffs' First Amended Complaint with prejudice. As detailed in the Memorandum filed concurrently herewith, this motion is made on the grounds that Plaintiffs have failed as a matter of law to state a claim upon which relief can be granted under the California Cartwright Act or California Unfair Competition Law. This motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities in support, all pleadings and papers on file in this action, and upon such oral argument as may be heard by the Court.

## CERTIFICATION OF MEET AND CONFER

Pursuant to Section I.C of the Court's Standing Order in Civil Cases, the undersigned certifies that counsel for Defendants met and conferred with counsel for Plaintiffs regarding the substance of this motion and potential resolution by videoconference on October 21, 2026. Counsel discussed the grounds for the motion set forth above and in the accompanying Memorandum. The parties were unable to resolve the issues presented by the motion, and meet and confer efforts have thus been exhausted.

Dated: October 23, 2026 Respectfully submitted,

/s/ Benjamin Wagner

**GIBSON, DUNN & CRUTCHER LLP**
BENJAMIN WAGNER, SBN 163581
310 University Avenue
Palo Alto, CA 94301-1744
Telephone:650.849.5395
Facsimile: 650.849.5095
BWagner@gibsondunn.com

THEANE EVANGELIS, SBN 243570
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:213.229.7000
Facsimile: 213.229.7420
TEvangelis@gibsondunn.com

RACHEL S. BRASS, SBN 219301
JULIAN W. KLEINBRODT, SBN 302085
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:415.393.8293
Facsimile: 415.393.8306
RBrass@gibsondunn.com
JKleinbrodt@gibsondunn.com

*Attorneys for Defendants Albertsons Companies, Inc. and Albertsons Safeway LLC*

/s/ Jeffrey D. Martino
(as authorized on October 23, 2026)

**BAKER McKENZIE LLP**
JEFFREY D. MARTINO, SBN 222805
452 Fifth Avenue
New York, NY 10018
Telephone:212.626.4203
jeffrey.martino@bakermckenzie.com

ANDREW L. BLACK, *pro hac vice*
815 Connecticut Avenue, NW
Washington, DC 20006
Telephone:202.452.7056
andrew.black@bakermckenzie.com

*Attorneys for Defendant Kalibrate Pricing Inc.*

/s/ Andre Geverola
(as authorized on October 23, 2026)

**ARNOLD & PORTER KAYE SCHOLER LLP**
MICHAEL B. BERNSTEIN, *pro hac vice*
JONATHAN I. GLEKLEN, *pro hac vice*
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone:202.942.5000
Michael.B.Bernstein@arnoldporter.com
Jonathan.Gleklen@arnoldporter.com

/s/ Daniel S. Savrin
(as authorized on October 23, 2026)

**MORGAN, LEWIS & BOCKIUS LLP**
DANIEL S. SAVRIN, *pro hac vice*
STEPHEN LABRECQUE, *pro hac vice*
One Federal Street
Boston, MA 02110-1726
Telephone:617.341.7700
daniel.savrin@morganlewis.com
stephen.labrecque@morganlewis.com

MINNA NARANJO, SBN 259005
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
Telephone:415.442.1000
minna.naranjo@morganlewis.com

*Attorneys for Defendant EG Retail (America), LLC*

/s/ David Gringer
(as authorized on October 23, 2026)

**WILMER CUTLER PICKERING HALE AND DORR LLP**
DAVID GRINGER, *pro hac vice*
EMMA ELLMAN-GOLAN, *pro hac vice*
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
Telephone:212.230.8864

ANDRE GEVEROLA, *pro hac vice*
300 N. LaSalle Drive, Suite 3500
Chicago, IL 60654-3406
Telephone:312.583.2300
Andre.Geverola@arnoldporter.com

D. ERIC SHAPLAND, SBN 193853
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone:213.243.4000
Eric.Shapland@arnoldporter.com

ESTHER HA YOON SOHN, *pro hac vice*
250 West 55th Street
New York, NY 10019-9710
Telephone:212.836.8000
Esther.Sohn@arnoldporter.com

*Attorneys for Defendants BP Products North America Inc., TravelCenters of America Inc., and TA Operating LLC*

*/s/ Jeffrey I. Shinder*
(as authorized on October 23, 2026)

**SHINDER CANTOR LERNER LLP**
JEFFREY I. SHINDER, *pro hac vice*
DAVID A. SCUPP, *pro hac vice*
14 Penn Plaza, 19th Floor
New York, NY 10122
Telephone:646.960.8602
jeffrey@scl-llp.com
david@scl-llp.com

KYLE J. ANGELOTTI, *pro hac vice*
600 14th Street, NW
Washington, DC 20005
Telephone:646.960.8632
kangelotti@scl-llp.com

**STOEL RIVES LLP**
MATTHEW SEGAL, SBN 190938
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone:916.319.4676
matthew.segal@stoel.com

*Attorneys for Defendants Circle K Stores Inc. and TMC Franchise Corporation*

david.gringer@wilmerhale.com
emma.ellman-golan@wilmerhale.com

SONAL N. MEHTA, SBN 222086
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone:650.600.5051
sonal.mehta@wilmerhale.com

RYAN DANKS, *pro hac vice*
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:202.663.6000
ryan.danks@wilmerhale.com

*Attorneys for Defendant Walmart Inc.*

*/s/ Micah G. Block*
(as authorized on October 23, 2026)

**DAVIS POLK & WARDWELL LLP**
MICAH G. BLOCK, SBN 270712
900 Middlefield Road
Redwood City, CA 94063
Telephone:650.752.2000
micah.block@davispolk.com

DANA M. SESHENS, *pro hac vice*
TINA HWA JOE, *pro hac vice*
450 Lexington Avenue
New York, NY 10017
Telephone:212.450.4000
dana.seshens@davispolk.com
tina.joe@davispolk.com

*Attorneys for Defendants 7-Eleven, Inc. and Speedway LLC*

*/s/ Carrie C. Mahan*
(as authorized on October 23, 2026)

**SIDLEY AUSTIN LLP**
CARRIE C. MAHAN, *pro hac vice*
COREY W. ROUSH, *pro hac vice*
1501 K Street, NW
Washington, DC 20005
Telephone:202.736.8809
carrie.mahan@sidley.com
corey.roush@sidley.com

TAYLOR N. RANDLEMAN, *pro hac vice*
787 Seventh Avenue
New York, NY 10019
Telephone:212.839.5915
taylor.randleman@sidley.com

*Attorneys for Defendants 7-Eleven, Inc. and Speedway LLC*

**TABLE OF CONTENTS**


**I. INTRODUCTION ........ 1**

**II. FACTUAL AND LEGAL BACKGROUND ........ 2**

**III. LEGAL STANDARD ........ 5**

**IV. ARGUMENT ........ 5**

A. The Complaint Does Not Plausibly Allege an Unlawful Agreement. ........ 6

1. Plaintiffs Fail to Allege a Rim to the Supposed Hub-and-Spoke Conspiracy. ........ 6

a. The FAC Does Not Plausibly Allege Parallel Conduct. ........ 7

b. Plaintiffs' Plus Factors Do Not Plausibly Suggest an Unlawful Agreement. ........ 11

c. The Alleged Conspiracy Is Economically Implausible. ........ 16

2. The Court Should Reject the Complaint's Improper Group Pleading. ........ 17

B. Plaintiffs Do Not Plead a Viable Information Exchange Claim Under the Rule of Reason. ........ 18

C. Individual Agreements Between Kalibrate and a Gas Station Defendant Do Not Violate the Cartwright Act. ........ 21

D. Plaintiffs Fail to State a Claim Under the UCL. ........ 22

1. Without a Cartwright Act Claim, Plaintiffs Do Not Allege Anything "Unlawful." ........ 22

2. Plaintiffs Do Not Identify an Unfair Business Practice. ........ 23

3. The Court Lacks Equitable Jurisdiction Over Plaintiffs' UCL Claim. ........ 24

**V. CONCLUSION ........ 25**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aetna UCR Litig.*, 2015 WL 3970168 (D.N.J. June 30, 2015) .......... 13

*Altman v. The Hartford*, 2026 WL 2279803 (E.D. Cal. Aug. 7, 2026) (Drozd, J.) .......... 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 6, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 1, 6, 7, 8, 10, 11

*Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736 (2024) .......... 24

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999) .......... 20

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) .......... 11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) .......... 11

*In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031 (N.D. Cal. 2021) .......... 18

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) .......... 19, 20

*In re Cal. Title Ins. Antitrust Litig.*, 2009 WL 1458025 (N.D. Cal. May 21, 2009) .......... 12

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) .......... 23, 24

*Cellular Plus, Inc. v. Superior Ct.*, 14 Cal. App. 4th 1224 (1993) .......... 8

*Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363 (2001) .......... 24

*In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) .......... 8

*In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193 (S.D.N.Y. June 25, 2025) .......... 9

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
184 F.4th 172 (3d Cir. 2026)....................16

*D'Augusta v. Am. Petroleum Inst.*,
117 F.4th 1094 (9th Cir. 2024)....................18

*Dai v. SAS Inst., Inc.*,
2025 WL 2078835 (N.D. Cal. July 18, 2025)....................10, 11, 12

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010)....................6

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012)....................25

*Doe v. CVS Pharmacy, Inc.*,
982 F.3d 1204 (9th Cir. 2020)....................24, 25

*In re Dynamic Random Access Memory Indirect Purchaser Antitrust Litig.*,
2020 WL 8459279 (N.D. Cal. Nov. 24, 2020)....................8, 11

*In re Dynamic Random Access Memory Indirect Purchaser Antitrust Litig.*,
28 F.4th 42 (9th Cir. 2022)....................7, 8, 13

*Eidmann v. Walgreen Co.*,
522 F. Supp. 3d 634 (N.D. Cal. 2021)....................23

*Element Biosciences, Inc. v. Illumina, Inc.*,
2026 WL 1497446 (N.D. Cal. May 28, 2026)....................24

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)....................12

*EVO Brands, LLC v. Al Khalifa Grp. LLC*,
657 F. Supp. 3d 1312 (C.D. Cal. 2023)....................13

*Exxon Corp. v. Superior Court*,
51 Cal. App. 4th 1672 (1997), *as modified on denial of reh'g* (Feb. 13, 1997)....................20

*Gibson v. Cendyn Grp., LLC*,
148 F.4th 1069 (9th Cir. 2025)....................1, 2, 6, 7, 11, 14, 20, 22

*Gibson v. Cendyn Grp., LLC*,
2024 WL 2060260 (D. Nev. May 8, 2024)....................1, 9, 15

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023)....................10, 11, 14, 15, 16

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007)....................10

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017)....................23

*Honey Bum, LLC v. Fashion Nova, Inc.*,
63 F.4th 813 (9th Cir. 2023)....................8

*Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*,
386 F. Supp. 3d 1308 (E.D. Cal. 2019)....................7

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019)....................12

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008)....................6, 8, 9, 11, 13

*Key v. Qualcomm Inc.*,
129 F.4th 1129 (9th Cir. 2025)....................24, 25

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)....................3, 15

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007)....................9, 11

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)....................8

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015)....................1, 7, 8, 9, 10, 11, 12, 16, 17

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
795 F.3d 1124 (9th Cir. 2015)....................7, 23

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978)....................19

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
562 F. Supp. 3d 1073 (E.D. Cal. 2021)....................21

*In re Netflix Antitrust Litig.*,
506 F. Supp. 2d 308 (N.D. Cal. 2007)....................9

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
939 F. Supp. 2d 1002 (N.D. Cal. 2013)....................21

*In re Packaged Seafood Prods. Antitrust Litig.*,
338 F. Supp. 3d 1118 (S.D. Cal. 2018)....................18

*People v. Burgos*,
548 P.3d 1024 (Cal. 2024)....................22

*People v. Hazlett*,
347 Cal. Rptr. 3d 612 (2026)....................22

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995)....................12, 17

*Roth v. Rhodes*,
25 Cal. App. 4th 530 (1994)....................20

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999)....................3

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)....................25

*Spoeri v. State Farm Fire & Cas. Co.*,
2026 WL 2601881 (C.D. Cal. Aug. 27, 2026)....................7

*Stiles v. Walmart, Inc.*,
639 F. Supp. 3d 1029 (E.D. Cal. 2022)....................21

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001)....................20

*Texaco Inc. v. Dagher*,
547 U.S. 1 (2006)....................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008)....................18

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975)....................19

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)....................19

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
588 F.3d 659 (9th Cir. 2009)....................17

*Wong v. Iovate Health Scis. U.S.A., Inc.*,
2025 WL 821451 (E.D. Cal. Mar. 14, 2025)....................24

**Statutes**

Cal. Bus. & Prof. Code § 13531(a)(2)....................17

Cal. Bus. & Prof. Code § 16720....................22

Cal. Bus. & Prof. Code § 17200....................23

Stats. 2025, c. 338, § 1, eff. Jan. 1, 2026....................22

**Other Authorities**

Canadian Competition Bureau, September 24, 2026: https://competition-bureau.canada.ca/en/how-we-foster-competition/education-and-outreach/competition-bureau-statement-regarding-its-agreement-kalibrate-protect-competition-canadian-retail#sec06....................13

*EG America boost fuel pricing efficiency with Kalibrate Pricing*, Kalibrate website, https://perma.cc/58HT-CNRE....................4

*Part 2: How Artificial Intelligence & Machine Learning Fit Into Your Fuel Pricing Strategy*, Kalibrate India website (Nov. 2, 2017), https://perma.cc/7PRG-2BUG....................4

*Would you make $1000 or $100,000 from fuel price automation*, Kalibrate website, https://web.archive.org/web/20260511025900/https:/kalibrate.com/insights/blog/would-you-make-1000-or-100000-from-fuel-price-automation/ (retrieved May 11, 2026)....................4

## I. INTRODUCTION

Plaintiffs claim that certain fuel companies' ("Gas Station Defendants") individual decisions to use a common software vendor, Kalibrate Pricing Inc. ("Kalibrate"), amount to a conspiracy to fix retail fuel prices in California. But the First Amended Complaint ("FAC") fails to allege facts that could support that conclusion. It never says when those retailers agreed with each other, to what they agreed, or how they agreed to anything, let alone to a price-fixing conspiracy. The FAC alleges no communications, no instance in which any Defendant's confidential data was used by another Defendant, and no prices moving in parallel. And while Plaintiffs make much of what they think Kalibrate's pricing software *can* do, the only thing the Gas Station Defendants are alleged to *actually have done* is license software from the same vendor to more efficiently manage their individual fuel prices—which is nothing more than "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). When confronted with almost the same bare theory of algorithmic price-fixing in a different industry, another court rejected it because the "mere use of algorithmic pricing . . . without any allegations about any agreement between competitors . . . to accept the prices that the algorithm recommends" could not survive. *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260, at *6 (D. Nev. May 8, 2024) ("*Gibson II*"), *aff'd*, 148 F.4th 1069 (9th Cir. 2025). The Court should reject Plaintiffs' attempt to capitalize on public concerns about gas prices by spinning a story of conspiracy without allegations suggesting actual collusion.

*First*, the FAC fails to adequately allege a hub-and-spoke conspiracy. Plaintiffs must allege not only agreements between each fuel company and Kalibrate but also an agreement among the fuel companies themselves. Without such a rim, the supposed hub-and-spoke conspiracy "is not a hub-and-spoke conspiracy at all." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 n.3 (9th Cir. 2015). The FAC identifies no direct evidence of a rim. Nor does it make out a circumstantial case: Plaintiffs lack any allegations of parallel pricing or the kind of "plus factors" required to infer collusion. Without that, "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557.

*Second*, Plaintiffs fail to state a valid antitrust claim under the rule of reason. Even if Plaintiffs allege an agreement of some kind, it is at most one to exchange information—which Plaintiffs must

show, not presume, is anticompetitive. To state such a claim, the FAC must allege relevant markets in which Defendants supposedly compete and exercised market power. The FAC does not do so.

*Third*, Plaintiffs' fallback theory—that each individual license between Kalibrate and a fuel company is itself an unlawful price-fixing agreement—is foreclosed as a matter of law. The Ninth Circuit rejected this argument in *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1082–83 (9th Cir. 2025) ("*Gibson III*"), where it found that software licensing agreements like those allegedly present in this case are "ordinary sales contract[s]," not restraints of trade that could violate the antitrust laws.

*Fourth*, Plaintiffs' derivative claim under California's Unfair Competition Law fails for all the same reasons that their antitrust claim fails. It should also be dismissed even if the antitrust claim is not, because the Court lacks equitable jurisdiction over a derivative claim when Plaintiffs otherwise have an adequate legal remedy—here, the treble damages they seek for the same alleged overcharges at issue in their antitrust claim.

For all of these reasons, Plaintiffs' FAC should be dismissed with prejudice.

## II. FACTUAL AND LEGAL BACKGROUND

Kalibrate provides pricing and location analytics software used in a variety of industries, including retail fuel. FAC ¶ 18. Plaintiffs allege that Kalibrate licenses its fuel-pricing software product, Kalibrate Fuel Pricing ("KFP"), to fuel companies operating gasoline and diesel stations across the country, including in California. *Id.* ¶¶ 18–29. According to the FAC, the Gas Station Defendants licensed KFP at different times in different parts of California to access confidential, competitively sensitive information from competing gas stations and (in some cases) automatically implement software-generated pricing decisions. *Id.* ¶¶ 19–29, 45, 71–77.

Stripped of conclusory characterizations, the FAC describes the conventional use of software for analyzing market data and providing pricing recommendations. A retailer licenses KFP and may elect to input "[its] own . . . inventory, pricing, cost, volume, and market data" into the system. FAC ¶ 64. The software recommends "prices to meet a given gas station's target margin." *Id.* ¶ 56. There is no allegation that the retailers share personalized price recommendations with one another—or that Kalibrate does so on their behalf. And there is no allegation that retailers are required to adopt the software's pricing guidance. *See id.* ¶ 49 (acknowledging operators can "manually override [KFP]").

Rather, Plaintiffs allege that individual Gas Station Defendants started using KFP at different times over 16 years, ranging from 2009 to 2025, and that each uses (or at some point used) KFP to generate fuel-pricing recommendations. FAC ¶¶ 45–49, 52, 71–77. Beyond these conclusory and general allegations, the FAC says little about how any (or all) of the Gas Station Defendants *actually* used KFP; instead, it focuses on how KFP allegedly *could* be used. For example, Plaintiffs allege that KFP can be configured to create pricing recommendations that are automatically pushed into prices offered at the pump. *Id.* ¶ 45. Plaintiffs also allege that KFP offers a "restoration" feature that would allow "nearly all gas stations in an area [to] raise their prices contemporaneously and by a large amount." *Id.* ¶¶ 6, 57. But the FAC does not allege that any Gas Station Defendant uses either functionality, nor does it identify any supposed instance in which any Defendant appeared to have done so. Plaintiffs map the locations of 32 gas stations in Yuba City and Marysville (only 11 of which are Gas Station Defendants' stations) but do not explain whether those locations used KFP during the class period, what prices any of these stations charged, or whether Gas Station Defendants' prices were higher than those of competitors who did not use KFP—let alone that prices ever increased simultaneously across the stations allegedly using Kalibrate's software. *Id.* ¶ 107 & Fig. 3; *see also id.* ¶¶ 58, 77, 152 (alleging prices at one location of Safeway, an Albertsons Companies-related banner, rose after adopting KFP without alleging any corresponding movement from neighboring stations).

The rest of Plaintiffs' allegations are based on cherry-picked excerpts of Kalibrate's marketing materials that, when read in context, make clear KFP is used by companies to implement their own pricing philosophies—not to agree on pricing. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (courts may "consider documents 'whose contents are alleged in a complaint'"); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (similar).

- **FAC ¶ 49:** Plaintiffs tout Kalibrate's marketing materials as saying "users surrender as much as 90% of their pricing decisions to its algorithm." But the source document emphasizes that customers retain full control over their data and pricing strategy: "You (via an automated process) will feed data (your own prices, competitor prices, your volumes, your costs) into your system, at the required frequency. . . . With a flexible rules engine, and more than 100 rules and validations, you can recreate your exact approach to fuel within

the system without compromise, ensuring every decision reflects your unique strategy."[1]

- **FAC ¶ 50:** Plaintiffs quote an EG America Manager as saying its "pricing decisions are being made automatically . . ." but omit the rest of the sentence which conveys that those pricing decisions were made "in accordance with the rules that we [EG America] have put in place." Plaintiffs further omit that the EG America Manager also stated that "[p]ricing is exclusively within the domain of [its] pricing department."[2]
- **FAC ¶ 68:** Plaintiffs characterize a marketing webpage as saying "automation" is a way to "coordinate price increases." But they leave out that "automation" is designed not to coordinate among multiple retailers but "to ensure choices [for one retailer's stations] are consistent with [the user's] pricing policy and—if any departures were made—why."[3]

The FAC even concedes elsewhere that KFP "for each customer is 'exclusively based on data entered by that individual customer.'" FAC ¶ 130.

Moreover, the FAC does not identify any instance in which a single Defendant allegedly received another Defendant's non-public pricing information, cost information, volume information, future pricing plans, or forward-looking forecasts through KFP. Nor does the FAC identify any pricing recommendation for any Defendant that was generated using a competitor's confidential information. Nor does the FAC allege that the Gas Station Defendants shared their pricing parameters with one another or even used similar rules. Nor does the FAC allege that KFP told any of the Gas Station Defendants that competing Gas Station Defendants were using KFP's pricing recommendations. Nor does the FAC allege that KFP's pricing recommendations must be adopted, nor any specific instance in which a Gas Station Defendant used KFP's recommendations to determine pricing at all. Nor do Plaintiffs allege that the Gas Station Defendants' prices moved in parallel; the lone, undated allegation

---

[1] *See Part 2: How Artificial Intelligence & Machine Learning Fit Into Your Fuel Pricing Strategy*, Kalibrate India website (Nov. 2, 2017), https://perma.cc/7PRG-2BUG.

[2] *See EG America boost fuel pricing efficiency with Kalibrate Pricing*, Kalibrate website, https://perma.cc/58HT-CNRE (the testimonial also recounts that "[p]ricing decisions are automatically executed according to rules established by EG America's pricing team").

[3] *See Would you make $1000 or $100,000 from fuel price automation*, Kalibrate website, https://web.archive.org/web/20260511025900/https:/kalibrate.com/insights/blog/would-you-make-1000-or-100000-from-fuel-price-automation/ (retrieved May 11, 2026).

about a price change says only that one gas station raised its prices, without alleging what, if anything, happened with competitor prices at the same time. *Id.* ¶¶ 58, 77, 152. Indeed, the FAC is nearly devoid of any Defendant-specific allegations.

In sum, the FAC alleges that each Gas Station Defendant had a license agreement with Kalibrate to use KFP but does not identify any agreement among the Gas Station Defendants regarding whether or how they use KFP. *See* FAC ¶¶ 21, 50, 71–77, 151. Nor does the FAC allege parallel conduct or sufficient plus factors to plausibly infer such an agreement was made. Nevertheless, Plaintiffs claim that Kalibrate formed a trust with the Gas Station Defendants, violating the California Cartwright Act and California Unfair Competition Law's unlawful and unfair prongs. *Id.* ¶¶ 173–91.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege sufficient "facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Although courts must accept *well-pleaded* facts as true, "'labels and conclusions'" and "'naked assertion[s]' devoid of 'further factual enhancement'" receive no such treatment. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557); *see Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (plaintiff "must plead not just ultimate facts . . . but evidentiary facts"). Accordingly, courts need not accept as true "allegations that contradict . . . matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## IV. ARGUMENT

Plaintiffs' Cartwright Act claim fails for three independent reasons, and their derivative UCL claim fails with it. First, the FAC does not plausibly allege an unlawful agreement, which is the predicate of any antitrust conspiracy claim. It identifies no "rim" connecting the Gas Station Defendants to the alleged hub-and-spoke theory, no parallel pricing, and no plus factors from which an unlawful agreement could be inferred. Second, even if Plaintiffs had alleged an agreement, the FAC fails to allege an antitrust violation under a rule of reason analysis because the FAC does not properly define a geographic market, let alone sufficiently plead that Defendants have market power or have caused anticompetitive effects in one. Third, Plaintiffs' fallback theory that each Kalibrate license is itself an

unlawful agreement is foreclosed as a matter of law under *Gibson III*, 148 F.4th at 1082. Finally, Plaintiffs' UCL claim is entirely dependent on their deficient Cartwright Act claim, identifies no independently "unfair" practice, and seeks equitable relief that this Court lacks jurisdiction to award.

**A. The Complaint Does Not Plausibly Allege an Unlawful Agreement.**

"The crucial question" in a case alleging an antitrust conspiracy is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Twombly*, 550 U.S. at 553. Plaintiffs' antitrust claim fails at this fundamental level because the FAC does not plausibly allege that Defendants agreed with each other to do anything, let alone to coordinate fuel pricing in California. To allege an agreement, an antitrust plaintiff must plead factual "allegations plausibly suggesting (not merely consistent with) agreement," *id.* at 557; that is, "something more than conduct merely consistent with agreement in order to 'nudge[] their claims across the line from conceivable to plausible.'" *In re Dynamic Random Access Memory Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) ("*DRAM II*") (quoting *Twombly*, 550 U.S. at 570); *accord Musical Instruments*, 798 F.3d at 1193. A plaintiff must also plead specific facts as to each defendant's conscious commitment to the alleged scheme: the "who, did what, to whom (or with whom), where, and when." *Id.* at 1194 n.6 (cleaned up); *see also Spoeri v. State Farm Fire & Cas. Co.*, 2026 WL 2601881, at *5 (C.D. Cal. Aug. 27, 2026) (applying standard to Cartwright Act claim). Plaintiffs fail to allege such facts here: They allege no "rim" to their hub-and-spoke theory, relying instead on conclusory assertions and out-of-context excerpts from incorporated Kalibrate marketing materials that, read in full, belie any notion of collusion.

**1. Plaintiffs Fail to Allege a Rim to the Supposed Hub-and-Spoke Conspiracy.**

The FAC fails to adequately plead a "hub-and-spoke" conspiracy to fix fuel prices. Alleging one requires (i) "a hub, such as a dominant purchaser"; (ii) "spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub"; and (iii) "the rim of the wheel, which consists of horizontal agreements among the spokes." *Musical Instruments*, 798 F.3d at 1192. Plaintiffs claim that Kalibrate is the hub of an agreement among the Gas Station Defendant spokes. But the "key agreements" in a hub-and-spoke claim are those along the rim because such a claim "depends on establishing those horizontal agreements" among competitors. *Id.* at 1193. No rim is alleged here, and

a "rimless hub-and-spoke conspiracy" "is not a hub-and-spoke conspiracy at all." *Id.* at 1192–93 & n.3; *see also Gibson III*, 148 F.4th at 1088 ("[I]ndividual agreements with a central party" without "agreement between the spokes . . . constitute[] a collection of purely vertical agreements.").[4]

To plausibly allege a rim, Plaintiffs must allege either direct or indirect evidence of a mutual understanding and commitment by the Gas Station Defendants—with one another—to use KFP to fix prices. *See Musical Instruments*, 798 F.3d at 1192–94. There is no alleged direct evidence of such a conspiracy: no agreements, no meetings, no communications, no witnesses. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) ("Direct evidence is smoking-gun evidence that 'establishes, without requiring any inferences' the existence of a conspiracy."). Thus, Plaintiffs must allege circumstantial evidence of an agreement—requiring both parallel conduct and plus factors. *DRAM II*, 28 F.4th at 46–47. The FAC contains neither, leaving Plaintiffs' theory legally insufficient and economically implausible.

**a. The FAC Does Not Plausibly Allege Parallel Conduct.**

The FAC supplies no facts showing parallel conduct by the Gas Station Defendants. Parallel conduct typically involves allegations that the defendants "undertook some action simultaneously." *In re Dynamic Random Access Memory Indirect Purchaser Antitrust Litig.*, 2020 WL 8459279, at *5 (N.D. Cal. Nov. 24, 2020) ("*DRAM I*"), *aff'd*, 28 F.4th 42 (9th Cir. 2022); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) (parallel conduct is "unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason"). That would include a pattern of parallel price increases, *see In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999), or adoption of unusually similar pricing practices "around the same time in response to similar market conditions," *Musical Instruments*, 798 F.3d at 1193 (citing *Twombly*, 550 U.S. at 553–54). The FAC lacks any such allegations.

At the outset, an antitrust plaintiff "must plead not just ultimate facts (such as a conspiracy),

---

[4] "[T]he analysis under [the Cartwright Act] 'mirrors the analysis under Federal Law because the Cartwright Act . . . was modeled after the Sherman Act.'" *Jain Irrigation, Inc. v. Netafim Irrigation, Inc.*, 386 F. Supp. 3d 1308, 1314 (E.D. Cal. 2019) (Drozd, J.) (internal citation omitted); *see also Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) ("[T]he analysis under the Cartwright Act . . . is identical to that under the Sherman Act.").

but evidentiary facts which, if true," will prove a contract, combination, or conspiracy that injures competition. *Kendall*, 518 F.3d at 1047. To allege an agreement, "the complaint must allege facts such as a specific time, place, or person involved in the alleged conspiracies." *Id.* (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 565 n.10); *accord Cellular Plus, Inc. v. Superior Ct.*, 14 Cal. App. 4th 1224, 1237 (1993) (noting that a Cartwright Act complaint "must allege specific facts" beyond the purpose or effect of the alleged agreement). Here, the FAC repeats the conclusory allegations that the Gas Station Defendants "combined with Kalibrate"; "combined among themselves"; and entered into Kalibrate contracts with the "specific knowledge and expectation" that the software would coordinate their prices with competitors. FAC ¶¶ 79, 82–83. But absent are any allegations about the who, what, when, or how of any actual hub-and-spoke conspiracy, including any such allegations pertaining to the Gas Station Defendants' alleged participation in such a conspiracy. Plaintiffs' conclusory statements are insufficient to allege a conspiracy. *See Kendall*, 518 F.3d at 1047 (requiring allegations of evidentiary facts); *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 321 (N.D. Cal. 2007) (hinting "at the possibility" of an agreement "is not sufficient even at the pleading stage").

Nor do Plaintiffs allege facts suggesting parallel conduct of any kind. First, the Gas Station Defendants decided to adopt KFP one by one over 16 years. The alleged fact that retailers license the same software does not establish that they pursue the same pricing strategy, much less that they conspired to fix prices. And in any event, their "slow adoption" of KFP "does not raise the specter of collusion." *Musical Instruments*, 798 F.3d at 1196. The FAC suggests that the alleged conspiracy started with Albertsons' adoption of KFP in 2009. FAC ¶ 77. But at that time, no other Gas Station Defendant is alleged to have used KFP. *See id.* ¶¶ 71–76. The other ten Gas Station Defendants supposedly adopted and stopped using KFP at various points over the next 16 years, including as recently as last year (2025) by Circle K. *Id.* Courts reject adoption over an even shorter time frame as too disparate to imply a conspiracy. *See Gibson II*, 2024 WL 2060260, at *4 (10-year span of defendants adopting revenue management software "suggest[s] a tacit agreement between [defendants] is implausible"); *In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *13 (S.D.N.Y. June 25, 2025) ("[U]nseasonably long delays between the allegedly parallel acts," as here, "will 'refute rather than support' allegations of conspiracy.") (quoting *In re Late Fee & Over-Limit Fee Litig.*, 528 F.

Supp. 2d 953, 962 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014)).

The reasons why are not hard to imagine. Who, for example, could Albertsons have conspired with in 2009 when Plaintiffs allege it was the first to license KFP? FAC ¶ 77. How does Circle K's decision to license that same product 16 years later suggest agreement with Albertsons? FAC ¶ 76. Unilateral decisions do not become a conspiracy simply because two companies decide to use the same service provider years apart from one another. *See Musical Instruments*, 798 F.3d at 1193 ("[T]wo firms may arrive at identical decisions independently, as they are cognizant of—and reacting to—similar market pressures."). Plaintiffs do not even allege the Gas Station Defendants all used KFP at the same time: 7-Eleven and Speedway only used KFP until 2023, two years before Circle K allegedly adopted it in 2025. FAC ¶¶ 73–74, 76. If anything, the substantial gaps in adoption suggest independent decisions made for each company's needs at different points in time—not a conspiracy. *See Musical Instruments*, 798 F.3d at 1195–96 (adoption "over a period of several years" did not suggest conspiracy over "similar reaction[s] to similar pressures within an interdependent market"). No alleged facts connect each Defendant's purported use of KFP to an alleged agreement to do so.

Second, the FAC's misleading assertion that "Kalibrate boasts in its marketing materials that in practice its users surrender as much as 90% of their pricing decisions to its algorithm" is insufficient to plead parallel conduct. FAC ¶ 49. Even if true, alleging that "users" (which may or may not include any Gas Station Defendants or their California locations) may have adopted "as much as 90%" of Kalibrate's pricing recommendations is "not reflective of the [*Defendants'*]" adoption of those pricing recommendations. *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *3 (D. Nev. Oct. 24, 2023) ("*Gibson I*"). This is indistinguishable from *Gibson I*, which deemed insufficient allegations that a software's "pricing recommendations are accepted 90% of the time" because that general statistic was not specific to the market, the product, or defendants—and in any event defendants "could be within the 10% that do not accept recommendations." *Id.*; *see also Dai v. SAS Inst., Inc.*, 2025 WL 2078835, at *3 (N.D. Cal. July 18, 2025).

Third, the FAC does not contain allegations that the Gas Station Defendants' prices moved in parallel, much less allegations of "unusual, lockstep pricing behavior." *In re Graphics Processing*

*Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007). Plaintiffs merely allege that Californians pay more for their gas than the national average. FAC ¶¶ 39, 148. Plaintiffs concede the legitimate reasons for that gap, *see id.* ¶¶ 40–41, which has existed "since roughly 2015"—before all but one of the Gas Station Defendants adopted KFP, *id.* ¶¶ 71–76, 148. Even setting aside the "obvious alternative explanation," *Twombly*, 550 U.S. at 567, the FAC never alleges that each Gas Station Defendant engaged in parallel price increases—let alone parallel price increases driven by parallel use of KFP—to produce that higher average price.

Plaintiffs suggest that KFP's "restoration" feature could be used by gas retailers to "raise their prices contemporaneously and by a large amount." FAC ¶ 57. To begin, using such a feature would not imply a plausible conspiracy as "conscious parallelism" is "not in itself unlawful." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). Regardless, the FAC does not allege that any Gas Station Defendant—much less all of them—actually used (or even had access to) that feature. *See* FAC ¶¶ 6, 57, 114. Nor does it allege any price increase by any Gas Station Defendant suggesting the feature *might* have been used. *See Gibson I*, 2023 WL 7025996, at *3 (no inference of agreement from allegations that products were offered, without alleging which defendants used them). Without allegations of parallel conduct, even "increasing prices" overall "are fully consistent with a free, competitive market." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).

If anything, Plaintiffs' allegations refute parallelism. Take Plaintiffs' allegation that fuel prices increased by three to four cents per gallon at one Safeway location after adopting KFP. FAC ¶ 58. Plaintiffs do not allege that other Safeway stations followed suit—as Plaintiffs' theory would imply if Safeway were using KFP to automatically update its stations' prices—let alone that any other Gas Station Defendant did so. The FAC does not even say whether any of the other Gas Station Defendants operate locations that *competed* with that Safeway location. These are precisely the kinds of omissions that doom generalized appeals to "parallelism" like Plaintiffs'. *See Dai*, 2025 WL 2078835, at *3 (no parallel conduct where plaintiff failed to allege specifics of when defendants used pricing algorithm to elevate prices); *Late Fee*, 528 F. Supp. 2d at 962–63 (price changes by different defendants at different times, without allegations tying them to one another, did not plead parallel conduct). Plaintiffs' failure to allege parallel conduct is fatal. *See Kendall*, 518 F.3d at 1048.

**b. Plaintiffs' Plus Factors Do Not Plausibly Suggest an Unlawful Agreement.**

Even if Plaintiffs sufficiently pleaded "allegations of parallel conduct" (which they have not), such allegations alone "are insufficient" to raise an inference of an agreement. *Gibson III*, 148 F.4th at 1083. Plaintiffs also must plead "enough nonconclusory facts to place that parallel conduct 'in a context that raises a suggestion of a preceding agreement.'" *Musical Instruments*, 798 F.3d at 1193–94 (quoting *Twombly*, 550 U.S. at 557, 560). These "plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Id.* at 1194. "[I]n practice, many plus factors have been found unhelpful as 'simply restat[ing] that a market is interdependent.'" *DRAM I*, 2020 WL 8459279, at *5 (quoting *Musical Instruments*, 798 F.3d at 1194–95). Here, the FAC's enumerated plus factors amount to nothing more than conclusory assertions that do not support an inference of agreement among the Gas Station Defendants.

***"High barriers to entry" and a "fungible product subject to inelastic demand" (FAC ¶¶ 108–11).*** These market characteristics are "just as likely to be consistent with innocent as unlawful behavior" because they make it "increasingly likely that lawful conscious parallel behavior or interdependent pricing (following each other's pricing decisions) will occur without prior agreement." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019). Therefore, such allegations are "neutral facts," *id.*, and are "not strong enough on [their] own to nudge Plaintiffs' claims of a horizontal agreement across the line from possible to plausible," *Dai*, 2025 WL 2078835, at *4; *see also Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 597 (N.D. Cal. 2019) (same). That is particularly true here because there is no allegation suggesting these market features could have facilitated collusion in this case. For one, it is easy for purchasers to avoid the effects of the alleged conspiracy by purchasing from non-conspiring sellers—which make up 60–75% of stations according to the FAC. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995); *see also* FAC ¶ 106. For another, "gasoline stations do not *produce gasoline*," and Plaintiffs do not allege that rival fuel stations could not "purchase and transport more gasoline" to quickly satisfy the greater demand they would experience if the Gas Station Defendants suddenly raised their prices and drove consumers to lower-priced options. *Rebel Oil*, 51 F.3d at 1442. In other words, consumers could avoid any supposed price-fixing and non-conspiring retailers could defeat it.

***"Motive, opportunity, and invitation to collude" (FAC ¶¶ 112–16).*** Gas Station Defendants' alleged motive to "increase their margins" (FAC ¶ 113) is similarly insufficient because a "common motive for increased profits always exists." *Musical Instruments*, 798 F.3d at 1194 n.8. Plaintiffs suggest in generic terms that Kalibrate provided Defendants with the "opportunity" to collude. FAC ¶ 112. But Plaintiffs point to no actual invitation to collude, let alone explain how Kalibrate provides an opportunity to collude. Instead, Plaintiffs merely acknowledge that Kalibrate's marketing materials advertise that its product will help customers improve efficiency and margins. FAC ¶¶ 113–14. Even if the materials supported the allegations, a mere "opportunity, without more, is not a plausible basis to suggest a conspiracy." *In re Cal. Title Ins. Antitrust Litig.*, 2009 WL 1458025, at *5 (N.D. Cal. May 21, 2009); *see also DRAM II*, 28 F.4th at 52 (allegations that defendants had an "ideal" opportunity to collude, without facts demonstrating actual communications or information exchanges, are insufficient).

***Alleged Government Investigation (FAC ¶ 133).*** Plaintiffs' reliance on a now-closed government investigation in Canada is equally unhelpful to their claims. First, a Canadian investigation has nothing to do with fuel prices in California. Second, that investigation closed with no finding against Kalibrate with respect to KFP. In its press release, the Canadian Competition Bureau states: "Following a thorough review, including the review of information produced in response to a court order, the investigation did not uncover evidence that [KFP] used confidential information from one retailer to determine pricing recommendations provided to competing retailers in Canada."[5] The Canadian Competition Bureau's finding that KFP was not used to share data across competitors suggests the absence of a conspiracy, not its existence.

---

[5] "Competition Bureau statement regarding its agreement with Kalibrate to protect competition in the Canadian retail gas industry," Canadian Competition Bureau, September 24, 2026: https://competition-bureau.canada.ca/en/how-we-foster-competition/education-and-outreach/competition-bureau-statement-regarding-its-agreement-kalibrate-protect-competition-canadian-retail#sec06 ("Canadian Competition Bureau Press Release"). This Court may take judicial notice of information on government websites. *See, e.g.*, *EVO Brands, LLC v. Al Khalifa Grp. LLC*, 657 F. Supp. 3d 1312, 1321 (C.D. Cal. 2023) ("[A] court can take judicial notice of a government's website."). The Canadian Competition Bureau did enter into a consent agreement with Kalibrate regarding a separate product, Kalibrate Market Intelligence (KMI), which is only offered in Canada and not at issue in this case. *See* Canadian Competition Bureau Press Release.

***Alleged "actions against self-interest" (FAC ¶¶ 117–32).*** Far from reflecting actions against self-interest, the FAC supports an independent motivation for each Gas Station Defendant's adoption of Kalibrate. As Plaintiffs acknowledge, licensing Kalibrate's software allows Gas Station Defendants to achieve operational efficiencies by streamlining pricing execution (including price reductions) (FAC ¶¶ 45, 125), reducing volatility (*id.* ¶¶ 47–48), and improving margins (*id.* ¶ 145), among other benefits. Where, as here, "defendants' conduct is just as easily explained by reference to their own self-interest," conspiracy is implausible. *In re Aetna UCR Litig.*, 2015 WL 3970168, at *20–21 (D.N.J. June 30, 2015); *accord Kendall*, 518 F.3d at 1049. Plaintiffs' attempts to allege otherwise fail.

First, Plaintiffs assert that Gas Station Defendants "maintain[ed] elevated prices" but fail to allege facts suggesting as much. The "elevat[ion]" Plaintiffs reference simply benchmarks average gas prices in California against the rest of the U.S.—not between California retailers that use KFP and those that do not. FAC ¶¶ 148–49. As a result, over 60% of the benchmark cited in the FAC is made up of California fuel companies that, per Plaintiffs' theory, were not part of the alleged conspiracy and therefore acted independently. And the FAC itself explains why gas prices in California are higher than other states: "geography, limited refining capacity, and emissions standards," "taxes and environmental programs," and "refinery consolidation and a dearth of out-of-market imports." *Id.* ¶¶ 40–41. Indeed, the Gas Station Defendants are alleged to also use KFP for fuel stations in other states—where Plaintiffs do not allege that prices are supercompetitive. *Id.* ¶¶ 19, 21. The FAC contains no support for the conclusory allegation that the Gas Station Defendants charged elevated prices according to any relevant competitive benchmark.

Even if Plaintiffs did allege facts suggesting the Gas Station Defendants charged "elevated" prices, that would not suggest an action against self-interest. FAC ¶ 148. Plaintiffs claim that higher prices would lead to fewer customers. *Id.* ¶¶ 119–20; *see also id.* ¶ 146. But such decisions are often profit-maximizing: courts recognize the "basic economic assumption [] that a firm's aim is to maximize profit, not gross revenue." *Gibson III*, 148 F.4th at 1083, 1084 n.9. As the Ninth Circuit observed in rejecting this same argument, "[r]ather than eliminating competition, pricing one's [products] in a manner calculated to maximize profits is how one competes." *Id.* at 1083.

Second, Plaintiffs contend that the "exchange of competitively sensitive information" is against

self-interest. FAC ¶ 127. Yet Plaintiffs "never quite allege (though they suggest by implication) that [Defendants] get nonpublic information from other [Defendants] by virtue of using . . . algorithmic pricing software." *Gibson I*, 2023 WL 7025996, at *4. Plaintiffs allege that customers provide Kalibrate with their own non-public data "to be processed," FAC ¶ 64, *but not* that Kalibrate *shares* that data with other customers or that processing the data provides access to any competitor's data, *id.* ¶ 127. They allege that the data is fed into Kalibrate's "multi-tenant Pricing Cloud," *but not* that the data is commingled, *id.* ¶ 128. And they allege that Kalibrate uses "customers' confidential" data to "set" prices *but not* that any customer's data is used to "set" prices for any other customer, *id.* ¶ 129. The closest the FAC gets is a conclusory assertion that KFP *helps* customers coordinate to avoid competing on price, with no explanation of how or why. *See id.* ¶ 132. But the FAC also contains a contradictory statement that Kalibrate told its customers that KFP "for each customer is 'exclusively based on data entered by that individual customer.'" *Id.* ¶ 130. This allegation refutes any inference that KFP facilitated collusion. This "attempt to create an inference of the exchange of nonpublic information in their FAC without actually alleging such an exchange" is insufficient, *Gibson I*, 2023 WL 7025996, at *4, especially where materials incorporated by reference rebut that inference. *See supra* Section II; *see also Khoja*, 899 F.3d at 1002 (incorporation-by-reference doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims").

This case parallels *Gibson*. There, defendant Las Vegas hotels rented rooms to tourists and licensed pricing software from Cendyn, including revenue-management software products. *See Gibson II*, 2024 WL 2060260, at *1–2. The plaintiffs alleged a "hub and spoke" conspiracy to increase the price of hotel rooms facilitated through Cendyn's product. *Id.* at *2. But, as here, Cendyn's software did not lead to an "exchange" of "any non-public information with each other." *Id.* at *4. So, while the plaintiffs alleged that hotel defendants "delegated their pricing decisions to Cendyn," the court dismissed the complaint because "failure to plausibly allege the exchange of confidential information from one of the spokes to the other through the hub's algorithms" ultimately "compels the conclusion that there is no rim." *Id.* at *4–5. So too here.

Plaintiffs' references to Kalibrate's alleged promotional materials do not fill the gaps—they

rebut the FAC's allegations. As Plaintiffs acknowledge, Kalibrate maintains that KFP "for each customer is 'exclusively based on data entered by that individual customer.'" FAC ¶ 130. The FAC's allegation that, "[i]n product demos, Kalibrate has also shown potential customers the confidential, non-public, competitively sensitive information of competing gas stations—including non-public, competitively sensitive fuel sales volumes—that Kalibrate would make available to them," *id.*, is entirely unsupported by allegations that any Gas Station Defendant received a demo or even that the "product" in the demo was KFP. *See Iqbal*, 556 U.S. at 678 ("naked assertions devoid of further factual enhancement" are insufficient) (cleaned up); *see also supra* p. 13. Regardless, it falls short of any actual allegation that non-public competitor pricing data was commingled in data sets that produced pricing recommendations for any Defendant. Indeed, the FAC alleges elsewhere that Kalibrate has "amassed" information from "public surveys[,] [] proprietary third-party reports, volume data, and surveillance of consumers' cellphone location data," but, conspicuously, *not* competitors' non-public information. FAC ¶ 59; *see Gibson I*, 2023 WL 7025996, at *5 (rejecting allegation that "gets close but does not quite say that nonpublic information from one [customer] would be shared with another [customer]").

The Third Circuit's recent decision in *Cornish-Adebiyi v. Caesars Ent., Inc.*, 184 F.4th 172 (3d Cir. 2026), offers no support for Plaintiffs' alleged hub-and-spoke theory. Unlike in *Cornish*, the FAC contains no well-pleaded allegations that each Gas Station Defendant gave Kalibrate "proprietary information knowing that competitors would benefit from it" or that there were "de facto data exchanges through the software, opportunities for the Defendants to conspire at various industry events, knowledge of each other's relationship with [the hub] through publications and events, [or a] sudden change in the [defendants'] business practices." *Id.* at 185, 189. Nor does the FAC allege the type of communications between hub-and-spoke defendants that were central to *Cornish*. There, plaintiffs alleged that software provider Cendyn conveyed to the casino-hotel defendants that "uniform adoption [of the software] would enable their access, under the auspices of a single shared algorithm, to one another's real-time, non-public pricing and occupancy data." *Id.* at 183. Here, by contrast, Plaintiffs identify no communications in which Kalibrate conveyed to Gas Station Defendants that customer data would be shared amongst them. To the contrary, Plaintiffs allege Kalibrate said the opposite. *See* FAC

¶ 130. And while the FAC relies on isolated excerpts from Kalibrate's marketing materials to try to suggest an agreement, those materials make clear that customer data was segregated and not shared with other customers.

At minimum, none of Plaintiffs' allegations describe the kind of "*extreme* action against self-interest" that "would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement." *Musical Instruments*, 798 F.3d at 1195 (emphasis added). The FAC includes no allegations that the Gas Station Defendants engaged in collective price increases in the face of market conditions such that their actions would only make sense if they had a prior arrangement in place. Nor does the FAC allege that any Gas Station Defendant's prices were higher than what independent profit maximization would predict. Where "the complaint itself" provides "ample independent business reasons" that would explain each Defendant's conduct "even absent an agreement among the defendant [gas retailers]," there is no "act[ion] against self-interest." *Id.* Plaintiffs have alleged nothing more than unilateral conduct from businesses seeking efficiency, predictability, and profitability—with no relevant plus factors suggestive of conspiracy.

**c. The Alleged Conspiracy Is Economically Implausible.**

The absence of any compelling circumstantial evidence is even starker because the claimed conspiracy makes no economic sense. *See William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles."). Allegations that are "no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market," are not enough. *Musical Instruments*, 798 F.3d at 1189, 1193–95. But that is all the FAC contains.

First, Gas Station Defendants could not create a successful cartel because, based on Plaintiffs' allegations, they collectively account for only 25–43% of any gasoline market and 25–50% of any diesel market. FAC ¶ 106. That means that even a fully coordinated price increase by the Gas Station Defendants would leave the majority of gas stations in any particular location at the supposedly lower, competitive rate. And the FAC concedes it would not be difficult for customers to switch to non-conspiring gasoline retailers: "[i]f a station raises its prices too much on its own, drivers will simply

divert to a cheaper nearby competitor or will purchase less fuel, rendering the price increase unprofitable." *Id.* ¶ 65. As a matter of basic economics, the Gas Station Defendants could not move either local or California-wide prices on these alleged facts even if they colluded to do so: Any elevated prices would be undercut by non-conspiring retailers that comprise the majority of the California fuel market. *See Rebel Oil*, 51 F.3d at 1441 (sellers charging supercompetitive prices "will suffer an immediate loss of market share to competitors," especially among gas stations, which can readily expand output).

This is exacerbated by the fact that gas prices are highly transparent. California law requires stations to advertise prices on signage clearly visible from the road. Cal. Bus. & Prof. Code § 13531(a)(2); *see also* FAC ¶ 67 (acknowledging that prices are "often public"). Gas stations can monitor nearby competitors to undercut posted prices—which Plaintiffs agree is healthy price competition. FAC ¶ 43. And nothing stops a driver from driving down the street to buy cheaper gas. There is thus no incentive for a minority group to coordinate pricing through KFP: If they try to raise prices above the competitive level, those increased prices will be posted and competitors who are not part of the alleged conspiracy then could undercut them. *See Musical Instruments*, 798 F.3d at 1193–95.

**2. The Court Should Reject the Complaint's Improper Group Pleading.**

The FAC also fails to allege an unlawful agreement because it relies on conclusory allegations, innuendo, and misleading half-quotes that are pleaded as impermissible group pleading in place of proper attribution of alleged conduct to each individual defendant. An antitrust complaint "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008); *see also In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1047 (N.D. Cal. 2021). "[G]eneral allegations as to all defendants" or to a group are "insufficient." *TFT-LCD*, 586 F. Supp. 2d at 1117. And courts routinely dismiss antitrust claims reliant on impermissible group pleadings. *See D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1104 (9th Cir. 2024) (finding that "vague statements that 'major oil companies' planned to reduce their oil production" without alleging "which [d]efendants of these 'major oil companies' reduced their production, or when or how they allegedly made these decisions" were insufficient); *Cal. Bail Bond*, 511 F. Supp. 3d at 1048 (finding that allegations were insufficient to

demonstrate each defendant's role in the alleged conspiracy); *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1184 (S.D. Cal. 2018) ("Plaintiffs impermissibly attempt to engage in group pleading.").

The FAC here is a quintessential example of impermissible group pleading: Plaintiffs define eleven distinct companies collectively as the "Gas Station Defendants" and allege that this undifferentiated group conspired with Kalibrate to fix gas prices, rather than explain the part each played in the supposed conspiracy. FAC ¶¶ 8, 50, 61, 64, 69, 79–83, 116–18, 127. The handful of Gas Station Defendant-specific allegations merely identify the parties and when each adopted KFP. FAC ¶¶ 71–77. Missing is any allegation of a specific Defendant coordinating whether or how they use KFP, let alone their use of shared competitively sensitive information, which competitor's information it allegedly received or used, how its use of KFP would allow it to coordinate prices, or when it supposedly agreed to join a price-fixing conspiracy. The FAC's assertion of local geographic markets magnifies this failure. Plaintiffs acknowledge that each Gas Station Defendant competes in some but not all local markets, yet they fail to lay out in which local markets each Defendant competes, including how KFP enabled specific Defendants to coordinate prices in those markets. This pleading defect is yet another independent reason to dismiss the FAC.

**B. Plaintiffs Do Not Plead a Viable Information Exchange Claim Under the Rule of Reason.**

Even if the FAC were read to adequately allege an agreement among all the defendants (which it does not), it still would not state a claim because it (a) alleges a theory that should be evaluated under the rule of reason and (b) does not allege essential elements needed for an applicable rule of reason claim. In antitrust cases, *per se* liability is reserved for only those agreements that are "'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Courts "presumptively appl[y] rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." *Id.* If Plaintiffs identify any trust among Defendants, it is one assessed under this default rule—for which Plaintiffs fail to plead the essential elements of a claim.

Stripped of conclusory labels, the FAC alleges that Kalibrate gathers industry data, much of it

public, and returns price recommendations to each customer separately. FAC ¶ 59. Plaintiffs do not allege that Kalibrate's recommendations bind any Gas Station Defendant or that any such Defendant followed them, surrendered final pricing authority to Kalibrate, or ever used the "restoration" feature. *See supra* Section IV.A.1.a. As a result, Plaintiffs advance a back-up allegation that Kalibrate facilitated information sharing—which "is not itself a *per se* violation of the Sherman Act." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency."). Such a claim is evaluated under the rule of reason, under which Plaintiffs' claim fails.

To avoid a rule-of-reason analysis, Plaintiffs invite the Court to conduct a "quick look." FAC ¶ 91. But this abbreviated framework is permitted only where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Any competitive effects here depend on the Kalibrate products each of the Gas Station Defendants implemented, how and when each used the KFP software, the nature of Kalibrate's pricing recommendations to that Defendant, and whether the Defendant followed those recommendations. None of that detail—required to move the allegations beyond the ordinary licensing agreements that "do not restrain trade," *see Gibson III*, 148 F.4th at 1083—is even alleged in the FAC, much less "easily . . . ascertained," as required for a quick-look analysis. *Cal. Dental*, 526 U.S. at 770.

Because Plaintiffs' claims must satisfy the rule of reason, they must "delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly." *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1682 (1997), *as modified on denial of reh'g* (Feb. 13, 1997) (quoting *Roth v. Rhodes*, 25 Cal. App. 4th 530, 542 (1994)). That includes a geographic market, the "'area of effective competition' . . . where buyers can turn for alternative sources of supply." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (citation omitted); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104–05 (9th Cir. 1999) (plaintiffs must "identify the relevant geographic and product markets in which Plaintiffs and Defendants compete").

The FAC appears to suggest the relevant geographic markets are "the areas in which the Gas Station Defendants' sites are situated within California." FAC ¶ 92. That is not a geographic market. It is simply a description of where the Gas Station Defendants happen to do business. The FAC defines the scope of competition between retail gas stations as local and circumscribed, ranging anywhere "from a few blocks to a few miles, depending on unique local circumstances." FAC ¶ 104. But Plaintiffs never define these local markets. And a tautological statement that Defendants compete where they do business fails to define with supporting *facts* an "area of effective competition." *Tanaka*, 252 F.3d at 1063.

In fact, Plaintiffs' allegations undermine their attempts to plead a geographic market. Plaintiffs allege that TravelCenters operates in Coachella, FAC ¶ 71, but name no other Defendant that does (let alone one within a few blocks or miles). Similarly, Plaintiffs identify only 7-Eleven as operating in Marina, *id.* ¶ 73, and only Circle K as operating in Westmorland, *id.* ¶ 76. At most, the FAC only claims the Gas Station Defendants operate stations "including in" certain named localities, *see id.* ¶¶ 71–77, without identifying specific overlaps, much less overlaps sufficient to support a relevant geographic market. *See Stiles v. Walmart, Inc.*, 639 F. Supp. 3d 1029, 1047 (E.D. Cal. 2022) (Drozd, J.) ("When a plaintiff relies on indirect evidence . . . it is necessary to 'define' the market: who was competing, what were they selling, and where.").

Plaintiffs' allegations that the relevant area of competition is "local, ranging from a few blocks to a few miles, depending on unique local circumstances" cannot suffice standing alone. FAC ¶ 104. For example, in *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, the court held that allegations that the defendants' conduct reduced competition in "local geographic markets" in Central California were insufficient. 562 F. Supp. 3d 1073, 1082–84 (E.D. Cal. 2021). Tables purporting to show certain counties and zip codes in which Defendants "had a dominant share" with no "limiting principles" or plausible explanation of "why these lines are appropriately drawn," were not enough to define the markets in "concrete geographic terms." *Compare id.* at 1083–84, *with* FAC ¶ 106 & Figs. 1–2. *See also Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013) (dismissing complaint where definition of "various regional markets in California and Oregon where [the parties] compete against one another" was "vague and conclusory"). That is even more the

case where each table in the FAC alleges that the Gas Station Defendants effectively *have a minority share* in each listed locality.

Nor can Plaintiffs salvage their case by claiming the tables in their FAC provide a "list of geographic locations within California *containing* local markets." FAC ¶ 106 (emphasis added). They allege that an economically appropriate relevant geographic market is much smaller: a few blocks or miles within these areas. The FAC does not elaborate further as to which few blocks or miles they are discussing. The closest it comes is a map that depicts an unbounded area in and around Yuba City and Marysville without establishing how far customers would drive to purchase fuel. *Id.* ¶ 107. The FAC offers nothing comparable for the other eight locations, nor for the rest of California.

**C. Individual Agreements Between Kalibrate and a Gas Station Defendant Do Not Violate the Cartwright Act.**

As yet another fallback, Plaintiffs allege that "each individual agreement between Kalibrate and each Gas Station Defendant constitutes an unlawful trust and an agreement to tamper with or fix prices." FAC ¶¶ 78–83, 176, 183. But the Ninth Circuit has squarely foreclosed this theory. In *Gibson III*, the Ninth Circuit found that individual licensing agreements between hotel defendants and their revenue-management software provider were not horizontal because the hotels and software provider were not competitors. 148 F.4th at 1082. Nor were the agreements vertical because the hotels and software provider did not "operate at different levels of distribution in the relevant market." *Id.* As a result, the licensing agreements were "ordinary sales contract[s]" that did "not restrain competition among [] Defendants in [the relevant] market" or "restrain the parties' abilities to compete in that market." *Id.* at 1082–83. The same is true here. Kalibrate is not part of the chain of distribution in the market for fuel; therefore, its agreements with the Gas Station Defendants are not vertical agreements, but rather "ordinary sales contract[s]." *Id.* at 1082. And the "independent choice[] . . . to obtain pricing advice from the same company" under such contracts is not anticompetitive because "obtaining information from the same source does not reduce the incentive to compete." *Id.* at 1083.[6]

Assembly Bill 325 ("AB 325") changes nothing here. It clarifies that it is "unlawful for a person

---

[6] At most, these would be vertical agreements subject to a rule of reason analysis that Plaintiffs do not make out. *See supra* Section IV.B.

to use or distribute a common pricing algorithm as part of a contract, combination in the form of a trust, or conspiracy to restrain trade or commerce." Stats. 2025, c. 338, § 1, eff. Jan. 1, 2026 (adding Section 16729(a) to the California Business and Professions Code). But the Cartwright Act already prohibits that conduct. *See* Cal. Bus. & Prof. Code § 16720. Plaintiffs admit as much, even as they try to invoke the new legislation. FAC ¶¶ 86–89, 173, 180, 189. Because AB 325 does not create a new theory of antitrust harm, it provides no escape hatch from the deficiencies that doom Plaintiffs' claims.

Regardless, AB 325 cannot be applied to conduct predating its January 1, 2026, effective date. California law is clear that "statutes are presumed to apply only prospectively, unless the Legislature expressly declares otherwise," *People v. Burgos*, 548 P.3d 1024, 1026 (Cal. 2024), which it did not as to AB 325. Plaintiffs attempt to avoid retroactivity problems by alleging AB 325 is "declaratory of [] existing law" based on statements from the drafters. FAC ¶ 88. But that "declaratory" language was removed from the bill before enactment and is not present in the final statutory text, Stats. 2025, c. 338, § 1, eff. Jan. 1, 2026, and that removal is "'most persuasive' that the act should not be interpreted to include what was left out." *People v. Hazlett*, 347 Cal. Rptr. 3d 612, 728 (2026) (collecting cases). AB 325 thus does not apply retroactively to reach the FAC's allegations that the Gas Station Defendants began adopting KFP as far back as 2009 and continued doing so over the next sixteen years. FAC ¶¶ 71–77.

**D. Plaintiffs Fail to State a Claim Under the UCL.**

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Plaintiffs allege that Defendants violated the "unlawful" and "unfair" prongs of the UCL. But both rely on Plaintiffs' Cartwright Act claim, which, as discussed above, fails for numerous reasons. The "unfair" prong claim also fails to satisfy any recognized test.

**1. Without a Cartwright Act Claim, Plaintiffs Do Not Allege Anything "Unlawful."**

The "unlawful" prong of the UCL "borrows violations of other laws" and can make them independently actionable. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation omitted). But if plaintiffs fail to state a claim for the underlying statutory violation, the UCL theory necessarily fails, too. *See Name.Space*, 795 F.3d at 1134 (dismissing UCL claims where the plaintiff failed to state a claim for an antitrust violation under the Cartwright Act); *Eidmann v. Walgreen*

*Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal. 2021) ("Thus, if the plaintiff cannot state a claim under the predicate law . . . the UCL claim also fails.") (cleaned up). Here, Plaintiffs' claim under the unlawful prong of the UCL rests entirely on their Cartwright Act claim, FAC ¶ 189, and therefore fails for the same reasons. *See Name.Space*, 795 F.3d at 1134; *Eidmann*, 522 F. Supp. 3d at 647.

**2. Plaintiffs Do Not Identify an Unfair Business Practice.**

Plaintiffs' unfair business practice claim under the UCL fails for at least two reasons. First, Plaintiffs' allegations in support of the unfair-prong claim overlap entirely with Plaintiffs' unlawful-prong claim (and by extension, their Cartwright Act claim) and so fail for the same reasons. Second, the FAC fails to plead unfairness under any formulation recognized by California courts.

***Overlap with deficient unlawful-prong claim.*** "[W]here the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Altman v. The Hartford*, 2026 WL 2279803, at *4 (E.D. Cal. Aug. 7, 2026) (Drozd, J.) (quoting *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017)); *accord Wong v. Iovate Health Scis. U.S.A., Inc.*, 2025 WL 821451, at *10 (E.D. Cal. Mar. 14, 2025) (Drozd, J.) (same; dismissing UCL claim); *Element Biosciences, Inc. v. Illumina, Inc.*, 2026 WL 1497446, at *10 (N.D. Cal. May 28, 2026). Plaintiffs' unfair-prong claim rests on the same alleged conduct and the same alleged Cartwright Act violation as their unlawful-prong claim. *Compare* FAC ¶¶ 174–85, *with id.* ¶¶ 189–91. Plaintiffs' unfair-prong claim thus fails for the same reasons that Plaintiffs failed to state a Cartwright Act claim. *See supra* Sections IV.A–C.

Furthermore, under California law, "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001). Permitting "a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct." *Id.* (citing *Cel-Tech*, 20 Cal. 4th at 185); *see also Beverage v. Apple, Inc.*, 101 Cal. App. 5th 736, 753–54 (2024), *review denied* (Cal. July 10, 2024) (a plaintiff may not use the UCL to "resurrect[] a failed antitrust

claim as an unfair business practice," "especially when, as here, the only other cause of action alleged . . . was a violation of the Cartwright Act") (citing *Cel-Tech*, 20 Cal. 4th at 182).

***Failure to plead unfairness.*** Plaintiffs do not adequately plead unfairness in any event. Courts evaluating unfairness in consumer cases apply one of three formulations: (1) whether the conduct violates the antitrust laws or their policy or spirit; (2) whether the practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers"; or (3) whether the alleged harm to consumers "outweighs" the utility of the challenged conduct. *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214–15 (9th Cir. 2020). None applies.

Plaintiffs do not allege conduct that violates the policy or spirit of the antitrust laws, which would require "an incipient violation of an antitrust law, or . . . effects [that] are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187; *see also Key v. Qualcomm Inc.*, 129 F.4th 1129, 1141 (9th Cir. 2025). Plaintiffs allege none of these. The FAC suggests that retailers independently chose (over almost two decades) to use pricing software from the same vendor, not that they entered any agreement with one another, exchanged competitively sensitive information, or coordinated their pricing decisions through Kalibrate. *See supra* Sections IV.A–B. Those allegations do not plausibly suggest an actual or threatened impairment of competition. *See Doe*, 982 F.3d at 1214–15; *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169–70 (9th Cir. 2012) (affirming dismissal where plaintiff failed to allege facts showing conduct threatened an incipient antitrust violation or harmed competition).

Nor do Plaintiffs satisfy the other tests. Defendants' use of Kalibrate's software is not immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers independent of Plaintiffs' antitrust theory, and the FAC never claims otherwise. It also does not plausibly allege that any consumer harm outweighs the utility of the challenged conduct—real-time market response and price adjustments (including reductions in price). FAC ¶¶ 45, 49, 58. The FAC therefore fails to plead unfairness under any recognized formulation.

**3. The Court Lacks Equitable Jurisdiction Over Plaintiffs' UCL Claim.**

The UCL authorizes only equitable relief. A plaintiff seeking equitable monetary relief in fed-

eral court must therefore establish the absence of an adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). Plaintiffs cannot do so. They seek treble damages under the Cartwright Act for the same alleged overcharges for which they request restitution and disgorgement under the UCL. FAC ¶¶ 178, 190–91; Request for Relief ¶ 192. Cartwright Act damages are "hardly an inadequate remedy" and therefore preclude equitable jurisdiction over Plaintiffs' duplicative UCL monetary-relief claims. *Key*, 129 F.4th at 1141–42.

## V. CONCLUSION

For the foregoing reasons, the Court should dismiss the First Amended Complaint with prejudice.

Dated: October 23, 2026

Respectfully submitted,


*/s/ Benjamin Wagner*

**GIBSON, DUNN & CRUTCHER LLP**
BENJAMIN WAGNER, SBN 163581
310 University Avenue
Palo Alto, CA 94301-1744
Telephone:650.849.5395
Facsimile: 650.849.5095
BWagner@gibsondunn.com

THEANE EVANGELIS, SBN 243570
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:213.229.7000
Facsimile: 213.229.7420
TEvangelis@gibsondunn.com

RACHEL S. BRASS, SBN 219301
JULIAN W. KLEINBRODT, SBN 302085
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:415.393.8293
Facsimile: 415.393.8306
RBrass@gibsondunn.com
JKleinbrodt@gibsondunn.com

*Attorneys for Defendants Albertsons Companies, Inc. and Albertsons Safeway LLC*

*/s/ Jeffrey D. Martino*
(as authorized on October 23, 2026)

**BAKER McKENZIE LLP**
JEFFREY D. MARTINO, SBN 222805
452 Fifth Avenue
New York, NY 10018
Telephone:212.626.4203

*/s/ Daniel S. Savrin*
(as authorized on October 23, 2026)

**MORGAN, LEWIS & BOCKIUS LLP**
DANIEL S. SAVRIN, *pro hac vice*
STEPHEN LABRECQUE, *pro hac vice*
One Federal Street
Boston, MA 02110-1726

jeffrey.martino@bakermckenzie.com

ANDREW L. BLACK, *pro hac vice*
815 Connecticut Avenue, NW
Washington, DC 20006
Telephone:202.452.7056
andrew.black@bakermckenzie.com

*Attorneys for Defendant Kalibrate Pricing Inc.*

<u>/s/ *Andre Geverola*</u>
<u>(as authorized on October 23, 2026)</u>

**ARNOLD & PORTER KAYE SCHOLER LLP**
MICHAEL B. BERNSTEIN, *pro hac vice*
JONATHAN I. GLEKLEN, *pro hac vice*
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone:202.942.5000
Michael.B.Bernstein@arnoldporter.com
Jonathan.Gleklen@arnoldporter.com

ANDRE GEVEROLA, *pro hac vice*
300 N. LaSalle Drive, Suite 3500
Chicago, IL 60654-3406
Telephone:312.583.2300
Andre.Geverola@arnoldporter.com

D. ERIC SHAPLAND, SBN 193853
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone:213.243.4000
Eric.Shapland@arnoldporter.com

ESTHER HA YOON SOHN, *pro hac vice*
250 West 55th Street
New York, NY 10019-9710
Telephone:212.836.8000
Esther.Sohn@arnoldporter.com

*Attorneys for Defendants BP Products North America Inc., TravelCenters of America Inc., and TA Operating LLC*

<u>/s/ *Jeffrey I. Shinder*</u>
<u>(as authorized on October 23, 2026)</u>

**SHINDER CANTOR LERNER LLP**
JEFFREY I. SHINDER, *pro hac vice*
DAVID A. SCUPP, *pro hac vice*
14 Penn Plaza, 19th Floor
New York, NY 10122
Telephone:646.960.8602
jeffrey@scl-llp.com
david@scl-llp.com

KYLE J. ANGELOTTI, *pro hac vice*
600 14th Street, NW
Washington, DC 20005

Telephone:617.341.7700
daniel.savrin@morganlewis.com
stephen.labrecque@morganlewis.com

MINNA NARANJO, SBN 259005
600 Montgomery Street, Suite 2300
San Francisco, CA 94111-2725
Telephone:415.442.1000
minna.naranjo@morganlewis.com

*Attorneys for Defendant EG Retail (America), LLC*

<u>/s/ *David Gringer*</u>
<u>(as authorized on October 23, 2026)</u>

**WILMER CUTLER PICKERING HALE AND DORR LLP**
DAVID GRINGER, *pro hac vice*
EMMA ELLMAN-GOLAN, *pro hac vice*
7 World Trade Center, 250 Greenwich Street
New York, NY 10007
Telephone:212.230.8864
david.gringer@wilmerhale.com
emma.ellman-golan@wilmerhale.com

SONAL N. MEHTA, SBN 222086
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone:650.600.5051
sonal.mehta@wilmerhale.com

RYAN DANKS, *pro hac vice*
2100 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:202.663.6000
ryan.danks@wilmerhale.com

*Attorneys for Defendant Walmart Inc.*

<u>/s/ *Micah G. Block*</u>
<u>(as authorized on October 23, 2026)</u>

**DAVIS POLK & WARDWELL LLP**
MICAH G. BLOCK, SBN 270712
900 Middlefield Road
Redwood City, CA 94063
Telephone:650.752.2000
micah.block@davispolk.com

DANA M. SESHENS, *pro hac vice*
TINA HWA JOE, *pro hac vice*
450 Lexington Avenue
New York, NY 10017
Telephone:212.450.4000
dana.seshens@davispolk.com
tina.joe@davispolk.com

*Attorneys for Defendants 7-Eleven, Inc. and Speedway LLC*

Telephone:646.960.8632
kangelotti@scl-llp.com

**STOEL RIVES LLP**
MATTHEW SEGAL, SBN 190938
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone:916.319.4676
matthew.segal@stoel.com

*Attorneys for Defendants Circle K Stores Inc. and TMC Franchise Corporation*

*/s/ Carrie C. Mahan*
(as authorized on October 23, 2026)

**SIDLEY AUSTIN LLP**
CARRIE C. MAHAN, *pro hac vice*
COREY W. ROUSH, *pro hac vice*
1501 K Street, NW
Washington, DC 20005
Telephone:202.736.8809
carrie.mahan@sidley.com
corey.roush@sidley.com

TAYLOR N. RANDLEMAN, *pro hac vice*
787 Seventh Avenue
New York, NY 10019
Telephone:212.839.5915
taylor.randleman@sidley.com

*Attorneys for Defendants 7-Eleven, Inc. and Speedway LLC*